# The Lexington & Ohio Rail Road Company *against* Applegate and Others.

[Mr. Guthrie and Mr. J. T. Morehead for the appellants: Mr. Crittenden and Mr. Pirtle for the appellees.]

FROM THE LOUISVILLE CHANCERY COURT.

CHANCERY.

Chief Justice ROBERTSON delivered the Opinion of the Court.

June 19.

THIS appeal brings up for revision a decree of the Chancellor of the city of Louisville, perpetually enjoining *the Lexington and Ohio Rail Road Company* "from running, using or employing their cars and carriages, by "steam or *otherwise*, upon their rail road along Main "street between Thirteenth street and Sixth street," in the said city.

VIII. 37

The decree—to be revised; by which the Louisville ch'r injoined the Railroad co. from running or using cars or carriages on a part of Main st. in that city.

| 8d 289 |
| 89  220 |

| 8d 289 |
| 90  52 |

| 8d 289 |
| 92  153 |
| 93  246 |
| 94  166. |

| 8d 289 |
| 100  637 |

| 8d 289 |
| 104  189 |

| 8d 289 |
| 108  666 |

| 8d 289 |
| 120  38 |

| 8d 289 |
| 133  615 |

| 8d 289 |
| 132  327 |
| 132  401 |

Spring Term
1839.

*Lex'n and Ohio
Rail Road*
vs
*Applegate &c.*

The incorporation of the co.— with power to locate & construct a rail road; the completion and use of some parts of it; and particularly, of a portion extending from Portland, through Main st. to 6th st. in the city of Louisville; located, constructed & used, with steam cars &c. in conformity to a privilege granted by the mayor and council of the city.

By an act of the Kentucky Legislature, approved in 1830, "the Lexington and Ohio Rail Road Company" was incorporated—with authority to construct a rail road from *Lexington*, to "some one or more points on the *Ohio* river;" and to use any land and materials, necessary for that purpose, by obtaining the consent of the owner, or by paying the value thereof, to be assessed upon a writ of *ad quod damnum*; and "to place on the road, when constructed, *all machines*, wagons, vehicles or *carriages* which *they* may deem necessary and proper for the purpose of transportation;" and, also, to exact a prescribed toll for transportation of persons and property on the rail road.

Having determined to make a point on the Ohio river, at or near the city of Louisville, the *terminus*, the company located its rail road from Lexington to Louisville, constructed it as far as Frankfort, and partially graded it between Louisville and Frankfort; and, desiring to extend the road, through Louisville, to the Ohio river, below "*the falls*," it obtained a supplemental act, in 1833, authorizing such extension.

Under the authority of these enactments, the company, with the concurrence of the Mayor and Council of Louisville, extended the location of its road, within that city, to a designated point in Jefferson street; and, having afterwards obtained the consent of the Mayor and Council to the construction of the road from Portland, below "the falls," to Thirteenth street; thence along Main street, to Sixth cross street, and thence to the wharf; with permission "to run its cars *by steam*, at the rate of not more than six miles an hour, between Sixth and Thirteenth streets"—it constructed the road accordingly, from *Portland* to the intersection of Main street and Sixth cross street, in *Louisville*; and, from the 29th of April, 1838, until arrested by the Chancellor, on the 26th of October, 1838, it had used the rail road between those points, chiefly by transporting daily about five hundred and fifty passengers, in cars, propelled generally by steam, though sometimes drawn by horses, at the price of twelve and a half cents for each passenger, instead of the accustomed hack charges,

which have generally been from twenty five cents to one dollar.

The injunction was granted on a bill filed by *Elisha Applegate* and forty three others, most of whom were either owners or occupants of property on Main street, between Sixth and Thirteenth cross streets; forty of whom were citizens of Louisville, and all of whom alleged that the rail road through the city, was a *nuisance*, *purpresture* and unlawful encroachment on their private rights of property.

The rail road company, in its answer, denied most of the principal allegations of the bill, and insisted that the road had not operated as a nuisance, or an encroachment on private right.

Between the granting of the injunction and the final decree, twenty six depositions were taken and filed— ten for the complainants, and sixteen for the defendant. And, on the final hearing of the case on the bill, answer and depositions, the Chancellor perpetuated the injunction, as originally granted, upon the following grounds, stated in the conclusion of a very copious and learned opinion, delivered when the first decretal order was made:—

" It seems to me that the jurisdiction of the Court to " interfere by way of injunction, is clear according to " established principles and precedents; that the case " shows a common nuisance, by which the plaintiffs have " special damage; a purpresture amounting to a nui- " sance; a disturbance of easements annexed by grant " to private estates, and of privileges dedicated and se- " cured by a public law of the general assembly of Vir- " ginia, in the streets and town of Louisville; of a cor- " poration abusing the powers arising out of the act of " incorporation, thereby working serious injuries to the " complainants; and finally of a disregard of private " rights, of a character continuous, vexatious, and de- " generating into a species of irreparable nuisance."

In addition to those already suggested, the following facts clearly appear: *first*—that, in 1781, Louisville— with its Main street and cross streets, from First to Twelfth, as now and ever since existing—was establish-

Spring Term 1839.

Bill, by numerous complainants, chiefly owners of houses & lots on Main st. alleging, that the road and the cars running upon it, are a nuisance, purpresture &c. —with injunction &c.

Answer of the co. denying the facts charged, (as above,) as grounds for the injunction.

Final decree perpetuating the injunction, upon grounds stated.

Recital of facts established in the case, and of facts and opinions as to which the witnesses differ.

Spring Term
1839.

*Lex'n and Ohio
Rail Road*
vs
*Applegate &c.*

ed by an act of the Legislature of Virginia, vesting the legal title in trustees, and declaring that purchasers of lots should " have and enjoy all the rights, privileges " and immunities which the freeholders and inhabitants " of other towns in this State, not incorporated by char- " ter, have, hold and enjoy." *Second*—that the lots, owned or occupied by the appellees on Main street, between Sixth and Thirteenth cross streets, had been purchased from the trustees, many years ago, and have been held by the purchasers and their alienees ever since. *Third*—that most of the wholesale and heavy business in Louisville, is, and ever has been, done on Main street, between Sixth and Second cross streets; that the population between Sixth and Thirteenth streets, is comparatively thin; and that the business houses on that portion of Main street, are chiefly retail shops, groceries and coffee houses. *Fourth*—that the title and authority of the trustees of the town passed, by the act of incorporation, to the Mayor and Council of the city of Louisville, subject to all then subsisting trusts, private rights and public obligations; and, *fifth*— that Main street is ninety feet wide; the rail road in the centre, with a single track; and the *entire* street, since the construction of this track, has been used as a passway for all persons and vehicles, without objection by the rail road company, and *without any assertion by it*, of an exclusive right to use that portion of the centre of it which is covered by, and included within, its *flat* iron rails.

But, as to the effect of the rail road, and of the use made of it by the company, there is much diversity in the opinions of the witnesses who testified in behalf of the appellees, and of those who deposed on the side of the appellant.

Some of the ten witnesses for the appellees expressed the opinion that, the rails of the rail road obstructed the free and convenient public use of Main street; some of them testified to facts conducing to show that the use made of the road by the company, and especially by the frequent transportation of passengers in a long train of cars, propelled by steam, alarmed horses, and endan-

gered the security of persons passing on foot, on horses and in hacks and private carriages; and all of them averred that, in their opinions, the rail road, as constructed and used, had the effect of diminishing the value of real estate on Main street, between Sixth and Thirteenth, and of injuring the commercial and manufacturing business of those who resided there; and that, therefore, it was a public nuisance, and an injurious encroachment on the private rights of the appellees and of many others.

On the other side—most of the sixteen witnesses for the appellant (and all of them who testified as to this point,) expressed the opinion, that the rail road itself was no obstruction whatever to the safe, free and convenient public use of the entire street by all who might choose to use any portion of it; and they stated facts strongly conducing to that conclusion. *All* of them expressed the opinion, that the prosperity of Louisville and the public interest had been promoted by the use that had been made of the rail road from Portland to Sixth cross street in the city, and would be still more advanced by the completion and use of the continuous line of rail road communication, according to the charter and the avowed purposes of the company. *No one* of them considered the use, as made, of the road, even with steam power, as being a *nuisance,* or as injuriously affecting the value of property, the productiveness of business, or security of persons on Main street between Sixth and Thirteenth, or elsewhere. Most of them were of the opinion that, as steam, when well regulated as a motive agent, may be more easily and promptly controlled than horse power, cars propelled by steam, with a velocity not exceeding six miles an hour, were more safe to the public than cars drawn by horses, and were not more perilous or inconvenient than hacks, stages and omnibuses. Some of them proved that, cars are run by steam through some of the towns and cities in Europe, and through *Orleans, Lancaster, Philadelphia, Richmond, Frederick,* and several other towns and cities in the United States, without having been considered *nuisances,* so far as they had heard or believed; and that some of the streets, through

Spring  Term
1839.

Lex'n and Ohio
Rail Road
vs
Applegate &c.

which long trains of cars moved by steam, are frequently running, are narrower, more populous, and much more thronged than Main street in Louisville between Sixth and Thirteenth cross streets. Some of these witnesses, also, indicate, by their testimony, more than an ordinary acquaintance with rail roads and steam power; and all of them state facts conducing persuasively to sustain all the opinions they have expressed.

It neither appears nor has been suggested that the speed of the cars, when propelled by steam on Main street in Louisville, had ever exceeded the prescribed rate of six miles an hour; and it does appear clearly, that the travelling and commercial public would be benefitted by the continued use of the rail road, as constructed and hitherto used, from Portland to the heart of Louisville; and the more especially, during that season of the year when boats cannot pass over the falls of the Ohio river.

Upon these facts, the Chancellor's decree is to be revised, and either affirmed or reversed.

The streets of Louisville were designated, not only for subserving the public purposes for which the town was established by law; but also, for the especial convenience and enjoyment of such persons as should purchase and hold lots contiguous to them. The title to such lots carries with it, as essential incidents, certain services and easements, not only valuable and almost indispensable, but as inviolable as the property in the lots themselves. And therefore, the owners and occupants of houses and lots on Main street, between Sixth and Thirteenth, have a peculiar interest in that street, which neither the local nor general public can pretend to claim—a private right of the nature of an incorporeal hereditament, legally attached to their contiguous ground— an incidental title to certain facilities and franchises assured to them by contract and by law, without which their property would be comparatively of but little value, and would never have been bought by them.

Although, therefore, an ordinary public way may be discontinued or applied to some other public purpose than that for which it was first established, without any

*The streets of a city or town, are established, not only for the public, but for the special convenience of those who may purchase the adjacent lots; & such proprietors have certain rights of use, facilities & easements, constituting franchises in the nature of hereditaments incorporeal, incident to their titles—which neither the general nor local public can claim, and which are as inviolable as the rights of property in the lots.*

*An ordinary road —in which no individual has any special interest*

legal liability for pecuniary compensation to the local public, or to any owner of adjoining land—because neither such public or proprietor had any right of *property* in the *way*, or any other legal interest in it than that which was common to all the people; and though also, the mayor and council, holding the legal title to the streets of Louisville, in trust chiefly for public purposes, might regrade and improve those streets, or authorize the public use of them, in any mode consistent with the objects to which they were first dedicated, without obtaining the consent of the owners of lots thereon, and without making any compensation to them—nevertheless, there may be no constitutional authority for closing or discontinuing any one of the streets, or even for applying it to any public or private use incompatible with any one of the ends for which such street was established, without first obtaining the consent of the owners of lots thereon, or without making just compensation to them, for any damage which may result to their property, corporeal and incorporeal, from such occlusion, discontinuance, or new application of the street.

The Commonwealth, with all her sovereign right of eminent domain, cannot take away private property, even for the most imperious or important public use, without either the owner's consent, or the payment to him of a just equivalent in money.

But we cannot concur with the Chancellor in the opinion that, the Commonwealth could not constitutionally exert her eminent authority, to take private property for public use, through the instrumentality of the rail road company. Public roads, of all sorts, may be constructed wherever the sovereign shall be pleased to have them; and if the public choose to avail itself of the capital and liberal spirit of select persons for insuring the construction of an important highway, the persons who

or right of way—may be discontinued, or applied to a new use, without the consent of the local public, or any individual. And the government of a town or city, may grade the streets or appropriate them to new uses, not inconsistent with the objects to which they were first dedicated, without the consent of the owners of adjacent lots, or compensation to them: yet where individuals have peculiar rights in a st. (*ut sup.*) it may be unconstitutional to discontinue it, close it up, or appropriate it to any purpose incompatible with its original dedication, without their consent, or a just compensation to them. For—

*The Com'th* cannot take private property, for even the most urgent public purpose, without the owner's consent, or just compensation made.

The Com'th may take property for public uses (just compensation being made,) thro'

the instrumentality of a rail road or turnpike company, or any other corporation or association. The public can act only through the agency of individuals; and when the privilege of making roads, or other improvements, for general use, is granted to any incorporation or association, it becomes the agent of the public; and all the rights—including the right of taking private property for public uses—which the State has, may be exercised through that agency, as well as any other; and all rail roads and other improvements, so constructed, are *public roads* or *improvements;* notwithstanding the tolls which they produce, may be appropriated—as they may be, constitutionally and lawfully—to the exclusive use of those persons (constituting corporations or associations) by whose capital and enterprise they have been created.

Spring Term
1839.

*Lex'n and Ohio
Rail Road*
vs
*Applegate &c.*

may agree thus to appropriate their own funds, may surely be permitted to enjoy, as some equivalent for the expenditure, the profits of tolls prescribed by law for using the road, and may be authorized to construct and preserve it by all the means which the Commonwealth could constitutionally employ. The sovereign will can be effectuated only by the instrumentality of agents. And, in the case just supposed, the private association should be deemed the agent of the public—although, as to its conventional privileges and profits, it may be only a private corporation; and the road also should be considered, in the popular sense, a public highway. In 4 *East*, *(2nd ed.) pa.* 21, it was adjudged that, though the Lord of the fee was entitled to the profits arising from the use of an established road, yet it was a public highway—" *le haut chemin le Roy.*" When the Legislature incorporates an association of private persons for the purpose of making a turnpike road or a rail road, the public welfare should be presumed to be the *legislative* object of the enactment; and though the interest of the corporators be private and exclusive, yet the construction of the road should be deemed to have been authorized for the public good, as the chief and primary object; and the act of incorporation and the privileges granted to the corporators, should be considered only as means for effecting the public end, and as secondary and incidental only. And, to accomplish such an end by such means; the sovereign power may undoubtedly, as we think, exert, through such an instrumentality, all the constitutional authority which it might employ for the effectuation of a similar object by any other agency or in any other mode. The rail road is applied to "public use," though the profits are appropriated to private use. And the legislative authority to take private property implied that, when so taken, it would be appropriated to the use of the public. The right of eminent domain has long been exercised in similar modes here and elsewhere, without question, and in instances almost innumerable. In this manner nearly all the turnpike roads have been made, and all the rail roads; and thus too are

mills established, by the condemnation of private pro-
perty, on the application of persons who desire to make
profit by the tolls: and the cities of Lexington and
Louisville and other incorporated cities thus only exer-
cise the power of opening new streets, by taking private
property, upon the payment of the assessed value of it,
to the owner or owners.

Spring Term
1839.

Lex'n and Ohio
Rail Road
vs.
Applegate &c.

This proposition was considered so indisputable, that
this Court, in the case of *O'Hara* vs. *The Lexington and
Ohio Rail Road Company*, (1 *Dana*, 232,) decided that an
appeal by *O'Hara*, from a judgment on an assessment of
damages upon a writ of *ad quod damnum*, should be af-
firmed, without argument, as a *delay* case—the only
ground for prosecuting the appeal being the assumption
that the Legislature had no constitutional power to
authorize the company to take his land without his con-
sent, even upon paying the assessed value of it.   Judge
Underwood did not, as the Chancellor seems to have
imagined, dissent from the opinion that there was no
plausible ground for seeking a reversal of the judgment.
In that opinion, he fully concurred; but, as the report of
the case itself will show, he thought the submission was
premature, *only* because the *appellant* had not filed the
record, and the case was submitted by the appellee, up-
on a record filed, without the appellant's concurrence,
only a few days after the appeal had been taken.   In
such a case, the Court did not consider it necessary to
write an elaborate opinion, but was contented with a
suggestion of the general reasons which it deemed satis-
factory—believing, as it did, that, upon such a point as
that then involved, such a brief and comprehensive
opinion was better than much amplification.   The brev-
ity of the opinion ought not, therefore, to have been as-
sumed, as it has been by the Chancellor, as proof that
the judgment of the Court was hasty and inconsiderate.
A similar judgment has been virtually rendered in many
other cases in this Court and in many other Courts; and
the Chancellor's decree exhibits the only opposing judi-
cial opinion we have seen or heard of: " *Aliquando bonus
dormitat Homerus.*"

Spring Term
1839.

*Lex'n and Ohio
Rail Road*
vs
*Applegate &c.*

The city government of Louisville had a right to permit the Lexington & Ohio Railroad Company to locate, construct and use the road in a street of the city; and having done so, no writ of *ad quod damnum* was necessary, unless the road, or some use made of it, was a purpresture or nuisance injurious to private property or private rights; & it could not be so considered, unless the road itself, or some use made of it, was inconsistent with the objects to which the street was originally dedicated.

But there was no writ of *ad quod damnum* in the city of Louisville.

Nor was such a proceeding necessary, unless the rail road, or the use of it, should be deemed to have been a *purpresture* or a *nuisance* operating to the damage of private property or the injury of some private right.

The purchasers of property on Main street, as on every other street, took their respective lots of ground subject to all the contingencies that might arise to it and to the use of it, from all the uses which might ever be made of the street as a public way, consistently with the objects of its original dedication.

If the construction of the rail road and the use made of it were not inconsistent with those public objects, nor with private rights, the mayor and council of the city of Louisville had an unquestionable right to authorize such construction and use of it, without any *ad quod damnum.*

Unless the rail road on Main street be, *per se* or otherwise, a nuisance either public or private, then, as all persons have an equal right to use the street, with carriages for transportation, consistently with the objects of its dedication, we cannot doubt that the Rail Road Company, under the sanction of its charter, and with the permission of the local municipality, had a right to lay its own iron rails in the street, for the purpose of facilitating the use it might rightfully make of it, in cars adapted to the improved mode of transportation on railways. And unless the rail road, either in itself, or in the use made of it, should be considered a *purpresture* or other *nuisance* injuriously affecting private rights, and which even the Legislature could not constitutionally authorize, there could have been no necessity for an *ad quod damnum*, to assess damages which no person could have been entitled to claim.

The supreme law requires such an inquisition only when private property is taken or applied to public use; and private property could not be considered as being thus taken or applied when there is neither any injury to or deprivation of any private *right*. Any injury to private *right*, by either the construction or the use of

the rail road, would be a private nuisance. And if the road, or the use made of it, did not thus operate, there was no necessity for an inquisition concerning damages. And therefore, in the language of *Justice Holroyd*, in *Rex* vs. *Russell et al.*\* we are clearly of the opinion that, unless the rail road, or the use made of it, should be considered, "upon the facts and merits, a nuisance, the neglect to make them the subject of an *ad quod damnum*, will not make them so."

Nor, if there be no such nuisance, could there have been any breach of the compact with Virginia, or an impairment of the obligation of any contract implied in the purchase of lots by the appellees and other citizens of Louisville.

If either *purpresture* or other nuisance injurious to the private *rights* of the appellees, be clearly established, the Chancellor may have had jurisdiction to enjoin such wrong.

But both public policy and a long series of adjudged cases require that, a public improvement, so beneficent in its general operations and results, and more especially when, as in this case, sanctioned by the Legislature and the representatives of the local public, should not be destroyed or suspended by the injunction of a *Chancellor*, unless strong reasons for doing it be conclusively manifested.

The only decisive or pertinent question to be judicially considered in this case, is, therefore, whether a *purpresture* or other nuisance injurious to private *rights* has been satisfactorily established by the appellees.

A *purpresture* being the appropriation to exclusive private use, or the enclosure for such use, of that which belongs to the public—it seems to us that the facts exhibited in this record, will not authorize the conclusion that the rail road itself, abstracted from the use made of it in the city of Louisville, was ever such a nuisance or wrong as is technically denominated *purpresture*.

case,) as not to occupy the street in which it is placed or any portion of it, exclusively—every part (as well that in which the rails are placed, as the rest,) being generally open and free for the ordinary purposes—it cannot be deemed either a purpresture or nuisance.—That the company may hereafter monopolize the use of the street, or that the charter allows it to do so, does not make the road a purpresture or nuisance now.

*Margin notes:*

Spring Term 1839.

*Lex'n and Ohio. Rail Road* vs *Applegate &c.* \*13 Eng. Com. Law Rep. 254.

The railroad used in the streets of Louisville could be no breach of the compact with Virginia, nor of any contract with the purchasers of lots, unless private rights were injuriously affected by it. But—If it was a purpresture or nuisance injurious to individuals, the chancellor might protect them, by stopping the use of the road, by his injunction.—But where the road and the manner of using it were authorized by both the legislature and city authorities, that power of the ch'r should not be exercised for such a purpose, without strong grounds, clearly established.

A purpresture is an enclosure, or appropriation, for private use, of that which belongs to the public. And—The Lexington & Ohio Rail Road, within the city of Louisville, being so constructed, (according to the proof in this case,)

Spring Term
1839.

*Lex'n and Ohio
Rail Road*
vs
*Applegate &c.*

The opinions and the facts presented in the record preponderate decidedly against any such deduction. And if, as should be presumed, in the absence of proof to the contrary, the road has been constructed as was required by the corporate authorities of Louisville, and as it certainly might have been constructed, it may not obstruct the public use of the whole street by any person who may wish to use any portion of it in any accustomed mode. And it is evident that the entire street—rail road and all—has been used by the public as a common highway for wagons, carriages, horses, and footmen, without objection by the Rail Road Company, or even the assertion of a right in the company to any exclusive use of that part of it covered by and contained within its rails. It appears to us, therefore, that there has been neither an enclosure of any part of the street by the company for its exclusive private use, nor any appropriation of any portion of it to such exclusive use, in merely constructing the rail way. If such exclusive use should ever be monopolized, or attempted, then it will be time enough to denounce the rail road as a *purpresture*. It is premature to utter such a denunciation now, merely because the charter vainly purports to confer the empty and unavailing right to such use.

Nor for the same reasons, can the rail road, in itself alone, according to the evidence and all proper deductions and presumptions, be deemed a nuisance in any effectual and injurious sense. This is virtually conceded by the Chancellor's final decree; for if he had considered the mere rails in the street as being a nuisance, he would, as we presume, have not left the nuisance remaining, as he has done, by only enjoining the running of cars upon the rails; but would have also required the removal of them, and a restoration of the street from their noxious effects.

That the company, may hereafter arrogate . exclusive rights in the street, does not prove, or tend to prove, that it is now a nuisance or purpresture.

Did the *use* which was made of the rail road on Main street operate as a nuisance, injurious to private rights?

This is the only remaining question we deem worthy of grave consideration.

As already intimated, we cannot concur with the opinion expressed by the Chancellor, that the possibility

that the company may at some future day, arrogate to itself the exclusive use of the rail road track along Main street, shows, or tends in any degree to show, that either the road itself, or any use hitherto made of it, should be deemed a nuisance. Nor can we doubt that the fact, that the appellants may have lost something of interest merely—such as a reduction in the profits of their business, or in the value of rents of houses—is insufficient to show a *nuisance*, or authorize an injunction. There must have been an invasion or deprivation of some right, before they could be entitled to any relief in a court of equity.

We have admitted that neither the constituted authorities of *Louisville*, nor the Legislature of the State, could either license a private nuisance, or could take or encroach on private property, without the owner's consent, or the payment to him of adequate damages, or could appropriate any street in Louisville to any use to which it was not originally dedicated, unless the consent of all those immediately interested in such street should be given, or just compensation should be first made to them.

But, even though some persons owning property on the rail road street, may be subjected to some inconvenience, and even loss, by the construction and use of the road, yet—if the use made of the road be consistent with the purpose for which the street was established, and also consistent with the just rights of all—such persons have no right, either to damages, or to an injunction; because they purchased their property, and must hold it—as all others purchase and must hold town lots—subject to any consequences that may result, whether advantageously or disadvantageously, from any public and authorized use of the streets, in any mode promotive of, and consistent with, the purposes of establishing them as common highways in town, and com-

The fact that a change in the modes of travel &c. may have had an injurious effect upon the business or rents in a street, is no cause for an injunction; private property or individual right must be affected to justify it.

Neither the government of a city, nor of the State, can license a private nuisance, or take, or encroach on, private property, without the owner's consent, or payment of his damages; nor can either government appropriate any street to any use to which it was not originally dedicated, without the consent of all those who have individual rights of property, or franchises, in the street or its uses. But the fact that a new use is made of a st.—not inconsistent with its original purposes, will not entitle the owners or tenants of adjoining lots to compensation, or to an injunction to prevent such new uses.—The owners of lots in cities and towns purchase them subject to all ad-

vantages and disadvantages from changes occurring in trade, travel, transportation, &c. And as the rail road in Louisville was authorized by the Legislature, and by the municipal government, and is an improvement in many respects advantageous to the city and general public, and destructive of the private rights, special privileges and franchises of no one, it cannot (as this Court thinks,) be deemed a nuisance.

patible with the reasonable enjoyment of them by all others entitled thereto.

As the Legislature and the local authorities of Louisville authorized the construction of the rail road through that city, and also authorized the company to employ upon it cars and steam power; and the more especially, as such improvements in the means of transportation must be useful to the travelling and commercial public, and, in many respects, obviously advantageous to the local public of the city itself—it does seem to us that, *prima facie*, the ordinary and careful use of the road, as thus authorized and prescribed, should not be deemed a *nuisance*, public or private.

This deduction is fortified by the fact already suggested, that rail road cars, drawn by horses, and propelled also by steam, are permitted to pass through other cities in both Europe and America, and have not in any instance been adjudged nuisances; and the facts proved in this case corroborate the same conclusion.

Main street in Louisville was established as a common highway for the universal public; and, as said in *Rex* vs. *Russell*,—"the right of the public is not confined to the "purposes of passage; *trade* and *commerce* are the chief "objects, and the right of passage is chiefly subservient "to those ends."

It must be an extreme and anomalous case, in which an improved mode of transportation, which not only facilitates passage, but promotes trade and commerce in and through the city of Louisville, could be deemed, nevertheless, a nuisance. It should never be so considered, unless, in its operations, it unreasonably circumscribes or excludes the rightful use or enjoyment of Main street by others, who have an equal right to the use and enjoyment of it.

*Russell* and *others*, indicted in England for a common nuisance, by the erection of staiths in the river Tyne, for facilitating the coal trade, were acquitted, on the ground that, though the erection abridged the common use of the river as a navigable stream, yet it was for a public purpose, was in a reasonable situation, left a reasonable space for the passage of vessels, and was bene-

ficial to *England*, by producing a reduction in the price and an improvement in the condition of coal. And the Court of King's Bench, consisting of *Lord Tenterden, Chief Justice, and Bailey and Holroyd, Justices*, refused a new trial—the two latter concurring, and the former dissenting only on the ground that he was inclined to think that it was not—as the jury had been instructed—the fact of benefit to *England*, but the fact of an improvement *in the business of navigating the Tyne*, which should be considered as decisive against the charge of nuisance.

In the case of *The King* vs. *Edward Pease and others*, (24 *Eng. Com. Law Rep.* 17,) the Court of King's Bench rather approved the decision in *Rex* vs. *Russell and others*, and seemed to recognize the principle that an injury to one mode of transportation and travel, by the rival use of another mode more beneficial to the public, was not a public nuisance. Under the authority of an act of Parliament, a rail road, with the statutory privilege of using steam power, had been constructed parallel with, and almost contiguous to, a previously established and then existing public turnpike, from *Stockton to Yarm*, in the county of Durham—and Pease and others were indicted for using, on the rail road, ten locomotive engines propelled by steam, to the great alarm of horses, and the annoyance and peril of persons travelling on the turnpike.

But, though the facts were proved, the accused were acquitted, and the Court of King's Bench approved the verdict, chiefly on the ground just suggested.

But, in the subsequent case of The *King* vs. *Ward*, (31 *Ib.* 91,) the same Court, in an opinion delivered by *Chief Justice Denman*, seemed to concur with *Lord Tenterden*, in the distinction intimated in his dissent in *Rex* vs. *Russell et al.* And we should be inclined to concur in this last view, as the more reasonable and authoritative.

The cases which we have just noticed, chiefly involved the question of *public* nuisance; but they recognize a plain principle applicable to this case; and that is, when applied to this case, just this—that, even if the

use of the railway in Louisville may, in some degree, have occasionally operated as an enclosure of a small part of Main street, along the centre of it, or diminished or rendered less convenient or free, other uses of it, by persons equally entitled to use it in other modes, still, though a compensatory benefit to the *general* public, might not be sufficient to show that it was, nevertheless, not therefore a nuisance, yet such a benefit to the business of *the street as a highway for passage, transportation and commerce*, resulting from such a use of the street, by the Rail Road Company, as did not unreasonably disturb others in the rightful use of it, could not be considered wrongful.

And this principle is evidently just and undeniable.

Unless, therefore, it clearly appears in this case, that, in the use made of the rail road by the running of cars upon it, other accustomed uses of it were excluded or unreasonably obstructed or abridged, or private rights invaded, the Chancellor's injunction cannot be maintained.

And this enquiry is divisible into two branches: *first*— was the running of *a car* on the rail road a nuisance? *Second*—did the length of the train of cars which were used upon it, or the frequency of the transits, constitute a nuisance?

<span style="margin-left:0"></span>*First.* As it appears clearly from the testimony, that a single car drawn by horses was not more inconvenient or perilous than a wagon, stage coach, or a hack, we are bound to infer judicially that, so far as the use of the rail road may be concerned, the *prudent* running of *one* such car upon it, cannot be deemed to have been a nuisance in any respect.

Nor do we feel authorized, by the facts now before us, to decide judicially that the *discreet* running of a single car propelled by steam, was any nuisance. We will not *presume* that the ordinary operations of a well regulated steam engine must necessarily be a nuisance in a city or town; and especially when, as in this case, we have facts and opinions of observant men, conducing strongly to the conclusion that a steam car in motion on the street of a city, is not, merely as such, a nui-

Conclusion, upon the evidence— that the rail road, with the use of a single horse-car, or single steam-car, or with a train of cars from 60 to 90 feet long, passing frequently, every day, along Main st. in Louisville,— being managed prudently, (as heretofore) not interrupting materially any of the ordinary uses of the st. nor preventing a free passage across it—cannot be deemed a nuisance, nor justify an injunction to prevent the use

Spring Term
1839.

Lex'n and Ohio
Rail Road
vs
Applegate &c.

sance, public or private.   A steam mill or manufactory has never, so far as we know, been adjudged a nuisance, merely in consequence of the peculiar character of the moving agent; nor has a steam boat or ship, merely as such, been ever considered a nuisance any where.   Rail roads frequently cross other highways; are sometimes parallel with them, and always pass, at some point, through a dense and travelling population.   And, of course, wherever they may be—if steam engines be used upon them—persons travelling in stages, private carriages, on horse, or on foot, are often subjected to some annoyance, inconvenience and hazard.   Steam boats, also, are necessarily prejudicial to other boats. but a steam car on a rail road, or a steam boat on a river, is not therefore *per se* a public or private nuisance: they have both become eminently useful, as means of commercial and social intercommunication; and their prevalence and success only demonstrate their great utility and general popularity.

of the cars, as heretofore—or a-ny limitation or curtailment of it: tho' the road and cars might be used, in various ways — some of which are here suggested—which would justify the interposition of the Chancellor. And should abu-ses hereafter oc-cur, the city au-thorities, have the power—in the right reserved in their grant of pri-vileges to the co. to apply an ef-fectual remedy. *Vide post.*

They may curtail the profits of carts, drays, *arks* and *wagons;* but they do this only because they are preferred, and the interests of society require the use of them. They may also do—as but too often they have done— private injury and personal damage.   But such occa-sional consequences must be expected from other agents of transportation in a populous and prospering country.

Therefore, according to the testimony in this case, we cannot decide that, either a horse car, or a steam car, running cautiously on Main street in Louisville, at the rate of only six miles an hour, should be deemed to be a nuisance to the public, or to the appellees, or any of them.

We are, therefore, of the opinion that, the Chancel-lor ought not to have enjoined the use of the railway altogether by the running of *any car* upon it.

*Second.* Nor do we feel authorized, by the facts as now presented to us, in this record, to decide that either the train of cars, as used on the railway, or the fre-quency of their transits, operated as a nuisance in judg-ment of law.   Though the train may have been gener-ally from sixty to ninety feet long, and though, also, it

viii. 39

may have passed frequently every day—yet it has not been satisfactorily shown that, either the crossing of the street has been unreasonably obstructed, or that the open spaces on each side of the railway were not always sufficient for the passage of wagons, carriages, horsemen, and foot passengers, without unreasonable inconvenience—unless the apprehension and surprise, occasionally produced by the novelty of the spectacle, the noise of the cars, and the puffings of the steam pipes, should be deemed unreasonable. But these alone we are not authorized so to consider, as we have already suggested. The proofs incline to the opposite conclusion. It would be unreasonable to use a longer train than the ordinary purposes of a safe and useful transportation should require. It would be unreasonble to make more transits than the same objects should demand. It would be unreasonable to detain the cars on the street, any longer than a faithful and vigilant superintendant should find necessary for effecting those objects, prudently, and as safely and conveniently to the rights of others as possible. It might be unreasonable to run a long train of cars in quick succession, and at uncertain periods and irregular intervals, so as to take the public by surprise. And it *might, perhaps*, be also unreasonable to use a train as long as ninety feet, or to make successive transits so frequently, on Main street, as was done when the cars were used upon it by the company.

But the facts, appearing in the record, do not enable us to determine, certainly or satisfactorily, that, in any of these particulars, the company had habitually, or even in any instance, transcended reasonable limits.

Nor are we convinced, by the facts now appearing, that any public right of passage upon, or other use of, Main street, or any franchise or personal security, has been unreasonably abridged by the railway, or by the use which has been made of it.

The evidence, when carefully compared and weighed, inclines to the opposite conclusion. And, considering the sparseness of the population on Main street, between Sixth and Thirteenth, and the character of the

Spring Term
1889.

Lex'n and Ohio
Rail Road
vs
Applegate &c.

business chiefly done in that portion of the city, it may not be unnreasoable to infer, from preponderating opinions in the record, that the use hitherto made of the rail road by the company, in the running of its train of cars, may not have been unreasonably prejudicial or inconvenient to the appellees, or to any portion of the public. If there has been, as alleged, some diminution in the profits of a few persons engaged in business between Sixth and Thirteenth, the facts authorize the inference, that this has resulted chiefly, if not altogether, from the translation of that business, by the cars, to other portions of the city, or from the conversion of it into some other and more useful business, in consequence of the facilities afforded by the rail road.

This is no ground of just complaint. It is but a common case in commercial cities; and will always occur, in a greater or less degree, from all improvements in the arts, and all public improvements for facilitating travel and commerce.

And it is evident, that the use of the railway, *as made by the company*, produced to the city of Louisville, and to the public generally, much more of good than of evil.

In such a case, we cannot decide that the use which had been made of the rail way in the city, had been so excessive, or injurious, or unreasonable, as to authorize this Court to require any prescribed curtailment or modification of that mode and kind of use. No facts appear which would enable us to determine the precise manner and extent of limitation upon the use, even if, as may not be altogether improbable, there had ever been, in any respect, any use unreasonably or unjustly inconsistent with private *rights*. As a guarantee against abuse, the municipality reserved the power of revocation, if the running of the cars, or the construction of the rail way itself, should ever become an obstruction to the free and common use of the street by the entire public, or should unreasonably endanger personal security.

The fact that the public authorities of Louisville have not interposed or complained, tends rather to repel the inference that the running of the cars has been unrea-

Spring Term
1839.

Lex'n and Ohio
Rail Road
vs
Applegate &c.

sonable or injurious. And the deduction from this circumstance, is, in some degree, corroborated by the fact that, only ten persons have deposed in favor of the appellees.

As, therefore, it does not satisfactorily appear from the record, that the rail road has been used in such a manner as to authorize restriction or modification by the order of this Court; and, as the evidence would not enable us to prescribe any precise curtailment or modification of the use of it by steam power and cars—we do not feel authorized to perpetuate the Chancellor's injunction to any extent, or in any respect.

Should any injurious abuse of the privileges conceded to the rail road by the mayor and council of Louisville, occur—they may exercise the right —which they reserved in making the grant—of revoking it. Or the co. may be restrained, or their operations may be regulated by injunction, upon such clear proof as will justify the interposition of the Chancellor.— But *the proof in the record* before this Court, is not sufficient to authorize any such interposition— which is all that this Court now decides; a case presenting a different state of fact, might require a different decision, and would not be affected by this.

If, hereafter it shall ever be ascertained satisfactorily, that an injurious abuse of its privileges is committed by the company, those privileges may be revoked by the official guardians of the interests of the citizens of Louisville; or the company may be restrained within reasonable limits by the Chancellor, upon ascertaining such facts as may enable him to prescribe proper and exact regulations for controlling the use of the road in the city. Were we to undertake such a task now, we should act without sufficient authority from the record before us, and should make a leap in the dark—whereby we might unjustly prejudice private rights and important public interests.

In such a case, involving such interests, no injunction should ever be decreed, without clear proof of a nuisance injurious to the private rights of the applicants.

If there has not been an unreasonable use of the rail road in Louisville, injurious to the rights of the appellees, we cannot sustain their injunction merely on the ground (if it had even been satisfactorily established,) that they may be subjected to some inconvenience, and even loss, in consequence of the novelty of this mode of transportation in their city, or the extent of its success in a fair competition reasonably conducted.

If a train of cars occasionally obstructed, in some slight degree, a perfectly free and convenient passage of a private carriage, or wagon, or horse, and produced some apprehension, and even damage, successive hacks, or stages, or omnibuses, with the same number of passengers, might perhaps have caused the like obstruction,

apprehension, and damage. Such inconveniences, whenever they may have occurred, might have been—and we cannot say they were not—the ordinary consequences of the free and common use of a public street in a commercial and prosperous city. And when they occur without negligence or wantonness, or unreasonable *purpresture*, they should be considered by the citizens, as evidences of the appreciation, rather than of the depreciation, of their property. For that very business and bustle which must inevitably produce some such occasional inconveniences, and collisions, and personal losses, Louisville was established, and its Main street made as it is. And, as that growing city shall continue to grow and prosper, similar accidents will more frequently occur, and be more sensibly felt. And, if there shall never be another steam car or horse car upon its street, hacks and omnibuses, perhaps as pestilent and not so suitable, will crowd the way, and supply their places—possibly to the disadvantage of the city and the whole community; and when too, the houses on the street, between Sixth and Thirteenth, will not, as now, be "few and far between," nor be occupied, as now, chiefly by retail shopkeepers and retailers of liquors.

The onward spirit of the age must, to a reasonable extent, have its way. The law is made for the times, and will be made or modified by them. The expanded and still expanding genius of the *common law* should adapt it here, as elsewhere, to the improved and improving condition of our country and our countrymen. And therefore, rail roads and locomotive steam cars— the offsprings, as they will also be the parents, of progressive improvement—should not, in themselves, be considered as *nuisances*, although, in ages that are gone, they might have been so held, because they would have been comparatively useless, and therefore more mischievous.

We know that a zealous and inconsiderate spirit of innovation and improvement requires the vigilance and restraint of both reason and law. We are fully aware, also, of the fact that, when such a spirit is abroad, private rights are in peculiar danger, unless sternly guard-

Spring Term
1 8 3 9.

Lex'n and Ohio
Rail Road
vs
Applegate &c.

ed by the judiciary; and we are not sure that such guardianship is not most needed in a government where whatever is popular is apt to prevail, at first and often at last, only because it is the *vox populi.*

This case has been, therefore, carefully and anxiously considered, under a full sense of its magnitude, and of all the responsibilities of an authoritative decision of it by this Court. After thus considering it, upon all the facts presented, we are unanimously of the opinion that, no cause has been sufficiently established, for enjoining the use of the rail road in Louisville, as the Chancellor did, altogether, or for enjoining even such use as had been made of it by the Rail Road Company.

We do not wish to be understood as deciding that, we are satisfied that the use of the rail way, as hitherto made, in Louisville, was not in any respect a nuisance. All we have decided, or intended to decide, is that the facts upon which alone we have had to adjudicate in this case, do not authorize the judicial deduction that a nuisance has been sufficiently proved. If it shall ever hereafter satisfactorily appear, upon other proof, that such use as that complained of by the appellees, encroaches on any private right, or obstructs the reasonable use and enjoyment of the street, by any person who has an equal right to the use of it, we shall be ready to enjoin all such wrongful appropriation of the highway.

The Rail Road Company having made its answer a cross bill, and prayed for damages sustained by it, in consequence of the injunction—the Chancellor, in his final decree, dismissed the cross bill absolutely; and the appellant complains, also, of that decree.

The Chancellor granted the injunction without requiring any bond or other security. Whether this was proper or not we need not now determine. But in this

Upon a bill charging that the Lex. & Ohio rail road, within the city of Louisville, & the steam cars &c. there used, were a perpresture & nuisance, the Ch'r granted an injunction, restraining the co. from running cars there—without requiring of the complainants any bond to pay any damages which the defendants might sustain by reason of the injunction. The company answered, denying the charge; and, making their answer a cross bill, they pray for damages occasioned by the suspension of their privileges and business. The complainants having failed to sustain their case by proof, their bill is to be dismissed, by the mandate of this Court; but, as no bond was required of the complainants, and it does not appear that they instituted, or prosecuted, their suit maliciously, or without believing that they had good cause—they are not liable for damnges, and the decree dismissing the cross bill is affirmed. The complainants can only be made liable, in such a case, by showing that their suit was malicious, as well as groundless—and then, the remedy, it seems would be at law, not in chancery.

state of case, if, as may be presumed, in the absence of proof to the contrary, the appellees filed their bill, obtained the injunction, and prosecuted the suit in good faith, believing that the rail way, or the use made of it by the company, was a nuisance operating to their private injury, it is our opinion that they are not, according to any adjudged case or established principle of equity or law, responsible for damages. As they have never undertaken to pay any damages in the event of an ultimate dissolution of their injunction, it seems to us, that they could now be made liable only for a malicious prosecution.

And not only is there no satisfactory proof of any such vexatious or wanton motive, but we are inclined to think that, if there had been, a court of equity was not the appropriate forum for assessing the damages, to which the appellant would, in that event, be entitled.

Whether, therefore, the Chancellor had jurisdiction over the matter of the cross bill, or whether he had not, his decree dismissing the prayer in that bill for damages, was, in our opinion, proper.

Wherefore, it is decreed by this Court that the decree of the Chancellor, dismissing the cross bill be affirmed; and that the decree perpetuating the injunction against the running of cars on the rail way on Main street, between Sixth and Thirteenth cross streets, in the city of Louisville, by the Lexington and Ohio Rail Road Company, be and the same is hereby reversed; and that the cause be remanded, with instructions to dissolve the said injunction, and dismiss the original bill, with costs.