Case 47.                                Dumesnil *vs.* Dupont.

Pet. Eq.                       APPEAL FROM LOUISVILLE CHANCERY COURT.

1. The jurisdiction of courts of equity to suppress nuisances has long
   been exercised, both in England and America, and cannot now be
   doubted; but the case must be clearly made out to authorize the
   application of this extraordinary power    (2 *Story's Eq. sec* 292,
   *and authorities there cited; Earl of Rippon vs. Hobart,* 1 *Cooper sel.
   cases.*

2. That a mere possibility exists that the erection of a powder house
   may result in injury to those residing in the vicinity will not author-
   ize the chancellor to suppress it.    (1 *Johnson,* 78; 6 *Hill,* 294 )

[The facts of the case are set out in the opinion of
the court.—Rep ]

*Hamilton Pope,* for appellant—

I will not weary the court with long discussion, or
an extended reference to authorities, as it has been
made by Mr. Fry.

The petition charges " no one is left in charge of
the powder house." Defendants deny this, and say
they have a trusty man in their employment whose
sole business it is to attend to it, and the carrying
powder to and from it; but they have not caused any
one to remain continually near it.   Now, this *trusty
man* is a *colored man,* (see affidavit of P. Welsh,) and
it does not appear that he is acquainted with the
mode of storing or keeping powder.   Yet, upon the
care of this man hang the lives of plaintiff, his fami-
ly and neighbors.

The affidavit of Alexander shows the precautions
the general government adopts with their maga-
zines.   No such precautions are used by defendants.
That *they* regarded the powder house as a nuisance,
is evident, from the fact that they concealed the
purposes for which the lot on which it was built was
bought.   (See affidavit of Brooks.)

They cannot complain if the powder house is abated, for they built it after plaintiff and Brooks, &c. built their houses. (See affidavits of Brooks and Ormsby.)

The powder house is so near, that if an explosion were to ensue, destruction, if not death, would ensue to the neighbors. (See affidavit of C. Ormsby, showing the distance, and affidavits of Roe, Lamer, Mackay, Payne, Ballinger, Blatterman, Lewis Collins, E. C. Smith, Rev. Mr. Grundy, &c., of Maysville, showing the effects of an explosion.)

The erecting or keeping powder mills and magazines near a town is a *nuisance*, for which an indictment will lie. (*Eden on Injunctions, page* 265.)

In *Attorney General vs. Utica Ins. Co.* 2 *Johnson's Ch. Rep.* 371, Chancellor Kent doubts whether courts of equity have jurisdiction to interfere by injunction in cases of public nuisance by which the enjoyment of private right is not violated, but from the decisions cited by Eden, it will seem that the English courts have now no doubt of their jurisdiction. (*Note* 6, *page* 268, *of Eden.*—See also *page* 268 *of same.*)

" The ground of this jurisdiction of courts of equi-
' ty in *cases of public nuisances, is undoubtedly their ability*
' *to give a more complete and perfect remedy than is attain-*
' *able at law,* in order to prevent *irreparable mischief.*"
(*Story's Equity,* 2 *vol. page* 202.)    " By a perpetual in-
'junction, the remedy is *made complete through all fu-*
' *ture time; whereas, an information or indictment at the*
' *common law, can only dispose of the present nuisance,*"
and " *they can interpose to restrain and prevent, as well*
' *as to abate.*"    (*Same,* 203.)

If then the erection of a powder house near a town *be a nuisance for which an indictment will lie, and courts of equity have jurisdiction to restrain and abate a public nuisance, even though an indictment will lie, defendant's powder house ought to be abated.*    Plaintiff's affidavits show that the rule established in, 1*st Swan's Rep.* 213–14, is the right one, and that a powder house, which is liable at all times to explode, (see Alexan-

der's affidavit.) and deal death and destruction around, ought to be held a nuisance, and that the court should interfere, for what mischief could be more irreparable than the death of plaintiff's wife and children? This powder house, particularly, ought to be held a nuisance, for the mode in which it is kept makes it liable to explosion.

A powder house remote from habitations, may not be for that reason a nuisance, but one like that in controversy, near a railroad, on a public thoroughfare, · near the habitations of men, visited by a negro, and no one to keep it, is a nuisance, and plaintiff, in my judgment, is entitled to have it abated.

*Fry and Field,* on same side, made the following points :

1. The Chancellor had jurisdiction of the case as stated in the petition, and cited 2 *Story's Equity, sec.* 924, *and notes thereto.*

2. The city charter of Louisville gives authority to the council to establish two magazines for powder within or without the city. (*Art.* 12, *sec.* 4, *page* 61.) The defendants do not pretend that they have authority from the city.

3. Every man has a right to live upon his land free from a justly apprehended danger, and especially are to be protected in the enjoyment of property which they have long occupied free from fear of danger. (3 *John. Chy. Rep.* 287.)

4. Keeping large quantities of powder near dwelling houses is a nuisance. (2 *Tucker's Black.* 194; 2 *Chitty's Black. side page* 217; 1 *John. Rep.* 79.) In this last case Judge Spencer said, "it did not depend upon the manner of keeping the powder." (See 1 *Burr.* 333; 1 *Swan's Term Rep.* 213.) This is the first case in Kentucky to injoin such a nuisance, and we ask the deliberate consideration of the subject before an affirmance.

*Bullitt & Smith,* for appellees—

Relied on the opinion of the Chancellor in this case, and the opinion of Judge Duvall in the case of *H. K. Lindsay, &c. vs. W. D. Loomis,* in the circuit court of Campbell county, at August term, 1855.

Judge DUVALL delivered the opinion of the court.

Feb. 2, 1858.

The appellant alleges in his petition that the defendants had erected, or were the owners, of a powder house situated on the Oakland plank road, within half a mile of the limits of the city of Louisville, within about three hundred yards of the appellant's residence, and but a short distance from his neighbor's houses. That large quantities of powder are kept constantly in the house; that no person is kept in charge of it, and it is liable to be fired or destroyed in various ways; that should an explosion occur, the family of appellant and those of his neighbors, would be greatly injured, if not killed, and their property destroyed; that they are greatly disturbed about the proximity of the powder house, and are seriously apprehensive of danger and injury; and he prays an abatement of the house as a nuisance, and for general relief.

The appellees, in their answer admit that they own, and are using the powder house for the purposes mentioned. They say it was built in 1853, and was used for the storage of powder until July, 1854, when they bought it for the same purpose, but without any knowledge that such use was objected to by any one. That they are merchants of Louisville, and furnish all the powder sold in that market, and keep in store only so much as will supply the demand of the public; that the supply of powder kept by them is a matter of great convenience to the public, and of advantage to the commerce of the city. That their magazine is well constructed, and is protected against accidents by secure fencing, lightning rods, and by the constant presence of a trusty man, whose sole business is to attend to it, and who alone is per-

mitted to enter it; that it stands in a sparsely settled neighborhood, and that should an explosion occur, the danger of which is very remote and improbable, it would not seriously injure either the property or family of the appellant or his neighbors.

The proof sustains substantially the allegations of the answer, except as to the probable effects of an explosion, in regard to which the witnesses differ. It is proved that the appellant's house stands about 330 yards from the magazine; another residence 500 yards distant, another 300 yards, and a tavern house about 260 yards. No effort was made to show by the proof, any defect in the arrangement or construction of the building, or any impropriety in conducting the business. So that the only question arising upon the record is, whether this powder magazine is a nuisance, the abatement of which is within the jurisdiction of the chancellor.

The power and jurisdiction of courts of equity in cases of nuisance, whether public or private, cannot now be questioned. It has long been recognized and acted upon by the courts of England and of this country, and is said to be founded upon the ability of such courts to give a more complete and perfect remedy than is attainable at law. But in all cases of this sort, courts of equity will grant an injunction to restrain a nuisance, public or private, only in cases where the fact is clearly made out upon determinate and satisfactory evidence, for if the evidence be conflicting and the injury doubtful, that alone will constitute a ground for withholding this extraordinary interposition. (2 *Story's Equity Jurisprudence, sec.* 924, *and the authorities there cited.*)

1. The jurisdiction of courts of equity to suppress nuisances has long been exercised, both in England and America, and cannot now be doubted; but the case must be clearly made out to authorize the application of this extraordinary power. (2 *Story's Eq. sec.* 924, *and authorities there cited; Earl of Rippon vs. Hobart,* 1 *Cooper sel. cases.*

In the case of the *Earl of Rippon vs. Hobart,* 1 *Cooper's Sel. Cases,* the principles which regulate and limit the jurisdiction of the chancellor in such cases, are thus stated by Lord Brougham: " If the thing sought ' to be prohibited is in itself a nuisance, the court will ' interfere to stay irreparable mischief without wait- ' ing for the result of a trial. But where the thing

'sought to be restrained is not unavoidably and in
'itself noxious, but only something which may, ac-
'cording to circumstances, prove so, then the court
'will refuse to interfere. The distinction between
'the two kinds of erection or operation, is obvious,
'and the soundness of that discretion seems unde-
'niable, which would be very slow to interfere,
'where the thing to be stopped, while it is highly
'beneficial to one party, may very possibly be preju-
'dicial to none. The great fitness of pausing much
'before we interrupt men in those modes of enjoying
'or improving their property which are *prima facie*
'harmless, or even praiseworthy, is equally manifest.
'And it is always to be borne in mind, that the juris-
'diction of this court over nuisances, by injunction, at
'all, is of recent growth, has not till very lately been
'much exercised, and has, at various times, found
'great reluctance on the part of the learned Judges,
'to use it even in cases where the thing or the act
'complained of was admitted to be directly and im-
'mediately hurtful to the complainant. It is also
'very material to observe, that no instance can be
'produced of the interposition, by injunction in the
'case, of what we have been regarding as an even-
'tual or contingent nuisance."

Various other authorities, to the same effect, might
be cited, but it is unnecessary. It may now be re-
garded as the settled doctrine upon this subject, that
courts of equity will never interfere by injunction,
to abate or restrain a so called nuisance, except in
the class of cases indicated. And this brings us to
the consideration of the question whether the pow-
der house of the appellees is, *per se*, a nuisance, pub-
lic or private?

The testimony shows that if a powder house or
magazine is properly constructed and managed, the
danger of an explosion is very slight; that the maga-
zines under the control of the government have never
or at least very rarely, been known to explode; that
the magnzines in the forts on the western frontier were

generally established within from thirty to one hundred feet of the quarters occupied by the officers and troops, and out of the great number of such magazines, not one explosion has occurred. One of the witnesses states that he has been familiar with the business of storing, transporting, and handling powder for more than twenty years, and that he recollects having heard of but two explosions within that period, one of which occurred at Maysville, the other at Nashville.

This record does not exhibit the number of powder houses that have been constructed in the United States for the last fifty years, or what number of them have exploded, or the amount of injury to persons or property that has resulted from such explosions, but we may venture the suggestion that if a calculation was made, based upon these data, according to the doctrine of chances, it would demonstrate that the danger apprehended by the appellants in this case is more imaginary than real, or at any rate that it is not such an *impending* or *probable* danger as would authorize the interposition of the chancellor. And we may remark, in this connection, that the vague generalities of the ancient common law writers, in defining a nuisance, would afford a very unsafe guide, in the investigation of questions of this sort, at the present day. For instance, it has been said by Lord Mansfield that " it is enough (to create a nuisance) if it renders the enjoyment of life uncomfortable;" and this is relied upon as authority in the case before us. But, as was held by this court in the case of *Lexington and Ohio Railroad vs. Applegate*, (8 *Dana*, 289,) " the law is ' made for the times, and will be made or modified ' by them. The expanded and still expanded genius ' of the common law should adapt it here, as else- ' where, to the improved and improving condition of ' our country and countrymen, and therefore *railroads* ' and *locomotives*, the offspring, as they will be the pa- ' rents of progressive improvements, should not, *in*

'*themselves*, be considered as nuisances, although in
' ages that are gone they might have been so held,
' because they would have been comparatively use-
' less, and therefore mischievous."

The point under consideration has been conclu-
sively settled by very high judicial authority. In
*The People vs. Sands*, (1 *Johns.* 78,) it was held that
the right of manufacturing and vending an article so
essential to the public defense, and of extensive pri-
vate consumption, will not be denied. " From this
' must follow the right of storing it, either for sale, or
' until it be wanted for national or other purposes.
' The only difficulty is to say how and where it shall
' be kept, and here the option of the owner must
' control, provided the lives of the surrounding or
' passing inhabitants be not thereby exposed to
' *probable* danger, either from the place or manner of
' keeping it. If mere *possible* injury be a ground for
' a prosecution, it will amount to a total proscrip-
' tion of the commodity. But if it be not permitted
' to place them (magazines) near to any dwellings or
' highways, who would be at the expense of their
' erection?"

The powder house in that case was situated near
the dwelling houses on a street in the city of Brook-
lyn, and it was held not to be a nuisance. Chief
Justice Kent concluded his able opinion with a quo-
tation from 3 *Atk.* that the *fears* of mankind will
not alone create a nuisance, without the existence
of *real* danger.

The same doctrine was recognized in the subse-
quent case of *Myers vs. Malcom*, (6 *Hill*, 294,) and in
numerous other American cases not necessary to
refer to.

The only adjudged case we have met with in
which the principle seems to have been differently
settled, is that of *Cheatham vs. Shearon*, (*Swann's Rep.*
213,) in which the learned judge argues that " there
' are few things one could do that would annoy the
' community more than the deposit of a large quan-

DUMESNIL.
*vs.*
DUPONT.

2. That a mere
possibility exists
that the erection
of a powder
house may re-
sult in injury to
those residing in
the vicinity will
not authorize the
chancellor to
suppress it. (1
*Johnson*, 78;
*Hill*, 294.)

'tity of gun powder in the midst of a populous ' city;" and " the fact that it is liable to explode by ' means of lightning, against which no human agen- ' cy could guard, is decisive of the question. If its ' explosion could only be produced by human agency ' alone, there would be much force in the reasoning ' of the majority of the court in *The People vs. Sands*, ' that the question, whether it is a nuisance or not, ' depends upon the manner in which it is kept." But even then, he says, " some accident might cause an ' explosion, and such would be the terrible and wide ' spread destruction from it, that the whole popula- ' tion would live in dread of some horrible catastro- ' phe." " But when we know that the electric fluid, ' the irresistible effects of which are disclosed in ev- ' ery thunder storm, may, in defiance of every pre- ' caution, at any moment, cause it to explode, it can- ' not be doubted that if five hundred kegs were ' stored in a magazine, in the heart of this city, ev- ' ery thunder storm would awaken an universal ' alarm and consternation in the minds of the inhab- ' itants."

This decision cannot be regarded as authority in the case before us for several reasons: *First*, because it was rendered in an action on the case brought by the owner of certain houses in Nashville, to recover for injuries done to them by the explosion of a powder house owned by the defentant situated in a populous part of the town. The two cases are therefore essentially different, both with regard to the facts involved, and to the nature of the relief sought. *Secondly*, because the principles and reasoning upon which the decision rests, are opposed to the unbroken current of modern authority, English and American, upon this subject. It assumes that whatever is calculated to create fears and apprehensions, however remote or uncertain or improbable the danger may be, is a nuisance *per se*. It is hardly necessary to refer to the consequences which would result from this sweeping doctrine. It would

not only expel gun powder from the vicinity of towns and cities to points remote from the habitations of men, inconvenient and in many cases inaccessible to the ordinary channels of commerce, but it would subject to the extraordinary jurisdiction of the chancellor, every railroad, and every factory, and all machinery propelled by steam, upon the ground that injury may result, or an explosion may occur, and that the continual apprehensions of danger, excited by these and similar causes, render the enjoyment of life and property uncomfortable. For it cannot be assumed, from anything appearing in this record, that a well constructed powder house carefully guarded and prudently managed is more dangerous than a locomotive passing through the densely populated streets of a city, or a large manufacturing establishment propelled by steam, surrounded by habitations within reach of the effects of an explosion that may occur at any moment. And yet neither the locomotive nor the manufactory has ever been adjudged a nuisance so far as we know.

It results from the view we have taken of the principles applicable to this case, that the injunction was properly discharged by the chancellor, and the judgment is therefore affirmed.