Denio, C. J.
The question whether the railway proposed to be constructed in Broadway would be a public nuisance, arose upon the pleadings, and it was a question of law. The width of the street and of the contemplated railway, its position relatively to the surface of the pavement, the length of the cars to be used, and the power by which they were to be moved, with the character of the street as a crowded thoroughfare extending through the heart of a populous city, were facts about which there was no material disagreement in the pleadings. The degree of inconvenience which the railway would occasion to persons owning or occupying property on the street, and the advantage and accommodation it would afford to the whole community, were, if material, open questions, to be determined by the evidence. If the admissions in the pleadings showed that the railway if constructed would be a public or private nuisance, neither the testimony or the finding of the judge would affect the legal result which would follow from these admissions. The questions to be determined are, therefore, whether the defendants had acquired a lawful right to construct the railway, and if they had not, then whether what they avowed they proposed *515 to do would in point of law amount to the offence of nuisance. If the transaction between the corporation on the one part and Sharp and his associates on the other, by whatever name it may be called, was a legal act, conferring upon the latter the rights and privileges which it proposed to give them, then it is impossible that the railway should have been a public nuisance, that being an offence which cannot be predicated of the lawful exercise of authority upon a subject to which it is applicable. It is therefore necessary to inquire in the first place whether the common council had power to authorize the construction and etablishment of the railway, according to the provisions of the resolution. If it shall appear that the proceeding was unauthorized and illegal, then it will become important to ascertain what the character of the act which Sharp and his associates propose to perform in Broadway, would be, if it were sought to be done by individuals of their own authority. A railroad has no necessary relation to or connection with a common highway or street. It may be laid along the surface of such a road where the grade will permit it, but it may equally well run through the country, remote from a highway, and upon a level graduated for the purpose. When a railroad and a highway coincide, the circumstance is simply accidental. They are separate and distinct agencies to facilitate passage and traffic, differing from each other in many essential particulars. The object of a highway or street is to afford to every citizen an opportunity to pass on foot or with his horses and carriages from one locality to another, and it is essential to the legal idea of such a road that it shall be common to all. Where the question on the trial of an indictment was, whether the place where an obstruction had been put was a highway, Sir Matthew Hale said that, to entitle it to that character, it must be a “way for all travelers.” (Austin's case, 1 Vent., 189.) “ The king’s highway ” is defined in English law to be a public, passage for the king and his subjects, and from *516 thence its name is derived; and the test whether a road is entitled to that designation is to inquire whether it be common to all the people. (Woolrych on Ways, 3.) A road does not cease to be a highway by being subjected to the control of a turnpike or plank road corporation, this being considered as a method of keeping it in repair, and of taxing the travel upon it for that purpose. (Benedict v. Goit, 3 Barb., 469; The Commonwealth v. Wilkinson, 16 Pick., 175.) Now, arailroaddoes not facilitate traveling on foot or on horseback, or with one’s own carriages. It does not generally admit of those methods of passage; although, where the railroad carriages are not moved by the power of steam but by horses, the tracks, where they do not rise above the street level, may be safely crossed, and, to a limited extent, may be used for passing lengthwise. This is, however, only incidental, and not a necessary feature of a railroad. Those' who use a railroad for its proper purposes do not travel according to their own volition, but are transported, like freight or baggage, by the proprietors of the road, in their own vehicles. But the feature which most widely distinguishes a railroad from ordinary highways and streets is, that the former is a strict monopoly, entirely excluding all idea of competition. A traveler who would go upon a railroad must take his seat in the carriage of the proprietors, and pay them the price of his transportation. The nature of the subject requires a unity of control and management, which precludes the existence of competing carriages. There may be rival, roads, but there can be no rivalry on the same road ; and no more than one road can exist in Broadway without excluding altogether every other kind of traveling with carriages. We may be allowed, without the testimony of witnesses, to know enough of the method of operating railroads to say that their carriages are quite unlike the vehicles used on other roads. They are necessarily large machines, occupying the space which would be required for several carriages of any other kind, and con *517 taining passengers enough to fill a great many of the carriages used on other streets or roads. I have mentioned these particulars which distinguish a railroad from every other species of way, for the purpose of explaining the reason why, in my judgment, the establishment of such a road is not within the jurisdiction conferred upon the corporation of New-York over the roads and streets in that city. The power of the corporation over this subject is necessarily very large. It may lay out, open, alter, repair and amend and regulate streets, lanes, alleys and highways, and may direct the draining, pitching and paving of them; and moreover, the common council are commissioners of highways, and they may discontinue and close up streets in the manner specified in the act. (The Montgomerie charter, Kent’s Charter, 15, 99, and note 31 at p. 235; R. L. of 1813, §§ 193-197; Laws of 1818, ch. 213; Laws of 1824, ch. 49.) But this power relates to and is confined to streets, lanes, &c., as such. Everything which is fairly within the idea of regulating, altering, repairing or amending the streets, with a view to their uses and purposes as streets, may be exercised by the corporation, but the converting of a street or a part of a street into a new piece of machinery for transporting persons with which the existence of a street has no natural or necessary connection, is not, in my judgment, at all within the purview of the charter and acts of the legislature to which I have referred. If an existing street can be converted into a railway, I see no reason why the corporation cannot authorize the laying out of a railroad where at present no street exists. They have as ample power to lay out and establish streets as to alter and amend them; and if they can consider a railway as falling within the legal notion of a street, the power extends as well to the laying out of new railroads as to changing the present streets into railroads. They can exercise the right of eminent domain in the opening of new streets, and if a railroad is only an improved species of street, the power could be rightfully *518 applied in constructing a railroad whenever it might be considered that the public good would be promoted by it. I have examined with respectful attention the several cases in which the power which I have been examining is claimed to have been expressly or impliedly affirmed. They are, without exception, cases in which the right to establish the railroad at- the places where it was proposed to be constructed had been granted, mediately or-immediately, by the legislature In some of them, it is true, the right was challenged on the ground that compensation "had not been provided for the taking of or the injury to private property, and the exception in that respect was not allowed. (Lexington and Ohio R. R. v. Applegate, 8 Dana, 289; Hamilton v. The N. Y. and Harlem R. R. Co., 9 Paige, 171; Drake v. The Hudson River R. R. Co., 7 Barb., 508; Plant v. The Long Island R. R. Co., 10 id., 26; Adams v. The Saratoga, &c., R. R. Co., 11 id., 414; Milhau v. Sharp, 15 id., 193; S. C., 17 id., 437, Stuyvesant v. Pearsall, 15 id., 244; Chapman v. The Albany and Schenectady R. R. Co , 10 id., 360; Williams v. The N. Y. Central R. R. Co., 18 id., 222, now under review in this court.) In none of these adjudications, with the exception of the one in the court of appeals of Kentucky, has the position which I am opposing been affirmed in a case requiring its determination, though it is true in several other cases, as in Drake v. The Hudson River Railroad Company, and in Adams v. The Saratoga Railroad Company, the position has been stated as contended for by the defendants’ counsel in this case, and in others it has been assumed to be the lai-v. It has been laid down in the case in Kentucky, and in Williams v. The New-York Central Railroad Company it may be said to have been decided by the supreme court of this state, that the laying a railroad in a street or highway is only a new and improved method of making use of the public easement over lands dedicated or appropriated, pursuant to law, for a street or highway. This doctrine has been predicated of what is truly said tc *519 be the plastic and accommodating nature of the common law. That system of jurisprudence is, no doubt, a code of principles, as distinguished from one of positive and arbitrary prescriptions; and where a doctrine of common law can, without violence, be applied to a state of things brought into existence by the change of times or the progress of civilization, it may often be properly applied, though the facts are circumstantially different- from those which existed when the rule was originally established. But the difference between a highway in the country, of a street in a city or village, and the modern contrivance of transporting persons by railroad cars running upon a grooved iron track, is, in my judgment, radical in its nature, and is not capable of being subjected to the same legal rules. The legislature appears to have taken the same view of the subject which I entertain, for whenever it has been considered necessary or proper to allow a highway or street to be used to any extent for the purpose of a railroad, the right has been conferred in express terms. The first railroad company chartered in this state was the Mohawk and Hudson, which was to run between Schenectady and Albany. The eleventh section of the act gives the directors the right, whenever it becomes necessary to cross anyroad or highway, to run the track “ across or upon” the same. (Laws of 1826, 289.) A similar provision is contained in all the railroad charters granted prior to the year 1836, when the Attica and Buffalo company was chartered with the same provision, connected with a direction to the company to restore the road so as not unnecessarily to have impaired its usefulness. (Laws of 1836, 325, § 11.) Most of the subsequent acts granting railroad charters adopted the Attica and Buffalo act as a pattern bill, with the provision respecting roads and highways which I have mentioned. In 1835, an act was passed for the benefit of associations or individuals who might engage in constructing a railroad upon lands purchased by themselves, by which the commissioners of highways were *520 authorized to give a written consent for the tracks to be laid across or along the highways. (Laws of 1835, ch. 300.) The constitution of 1846 enjoined upon the legislature the providing for the creation of corporations by general acts; and accordingly, in 1848, and again in 1850, general statutes were enacted for that purpose, in each instance containing a provision similar to the one which has been referred to in the several special charters, enlarged by giving the corporations of cities the powers conferred upon commissioners of highways. (Laws of 1848, 227, § 19, subd. 5; Laws of 1850, 224, § 28, subd. 5.) The special subject of railroads passing through or terminating in cities, early engaged the attention of the legislature, and in particular cases where such roads termined in the city of New-York, express power was given to the municipal government to license their location in the streets. (Charter of The N. Y. and Harlem R. R. Co., Laws of 1832, 156, § 1; charter of The Hudson River R. R. Co., Laws of 1846, 272, § 1.) It will be remembered that the cases provided for in. these statutes were railroads running from one part of the state to another, and to be located for the most part in the country, and upon land to be purchased or acquired by the companies, and where the intersection of a highway, or the running upon the streets of a city, was merely an incident of the general design, and where the whole enterprise would be greatly, embarrassed or entirely frustrated unless some power to run upon highways or streets were vested in some public body or magistrate. The acts assume that, without legislative authority, the railroad corporations would have no right to interfere with any public road or street. To leave no doubt respecting the intention of the legislature, an act was passed, in 1854, expressly forbidding the municipal councils of cities to permit a railroad commencing and ending in the city to be established in any street or avenue without the consent of a majority in interest of the owners of property upon the street. (Laws of 1854, ch. 140.) The corporation of New- *521 York, in the. instance under consideration, assumed to establish a railroad running wholly on a city street, without any other legislative authority than the general power to regulate, amend and alter the streets, roads and alleys of the city. Up to a certain period the supreme court of this state seem to have entertained the views upon 'this subject which I have considered sound. In Fletcher v. The Auburn and Syracuse Railroad Company (25 Wend., 462), and again in The Trustees of the Presbyterian Society in Waterloo v. Auburn and Rochester Railroad Company (3 Hill, 567), the question arose, whether the clause in the railroad charters to which I have referred furnished a defence to a railroad company against the reclamation of the owner of the soil in a highway over which a railroad had been located. In other words, the point to be determined in each of these cases was, whether an easement for the purpose of a highway authorized, as against the proprietor of the soil, the laying down of a railroad upon the track of such highway. The court decided against the railroad companies, holding that the statute related only to the right of the public; and that if it could be construed to affect the interest of the individual proprietor, it was void for want of a provision for compensation. It was held that the use of the land by the railroad company was wholly different from that public right of passage, to promote which highways were established. These cases, if correctly decided, are conclusive upon the question we are examining. It was said on the argument of the present case that these adjudications were inconsistent with the resolution of the court of errors in Bloodgood v. The Mohawk and Hudson Railroad Company (18 Wend., 77), to the effect that the legislature may authorize a private company to take the property of a citizen for the construction of a railroad, making provison for compensation. It is a sound inference from this principle that the construction of a railroad is to be regarded as a public object and that it promotes the public good. But it by no means follows that it *522 is an object of the same nature as that which highways are established to subserve. Where an easement is granted or acquired for a public highway, the owner of the soil cannot complain of any use which the land may be put to, substantially of that character; but it cannot be lawfully appropriated without compensation for the construction of an arsenal or magazine, or a market, though such structures should be authorized by the legislature for purposes purely public. It may be that, in the case reported in 25 Wendell, the court overlooked the principle that compensation is not necessary to "be made where property is not taken, but only subjected to consequential damages by means of a public work. (Radcliff's Executors v. The Mayor, &c., 4 Comst., 205, per Bronson, J.) But conceding that to be so, it does not affect the authority of the case as to its application to the present question.
The foregoing considerations have led me to the conclusion that the resolution of the common council, granting to the defendant Sharp and others the right to lay down a railroad in Broadway, was without the scope of the powers of the corporation, and was wholly unauthorized and illegal.
But I think it was illegal for another reason. It is not pretended that more than one railway can be laid down in that street without destroying it as a road for the passage of other carriages and vehicles. The resolution did not contemplate any participation on the part of the public or the citizens generally in the ownership or in the profits of the contemplated railway. Indeed, it is not susceptible, as has been shown, of any such participation. The public might, indeed, as passengers, be benefited by the use of it; but as a business enterprise it was to be carried on by and for the emolument of the associates alone. The manifest design of the resolution was to confer on the associates the exclusive right of carrying passengers by railroad on this 'public street for profit, and it was this circumstance alone which rendered it of any value to those who sought to obtain it. I will *523 suppose, then, that it would be wholly unobjectionable as an obstruction in or an interference with the street, and that it would not impair in the slightest degree the adaptation of that thoroughfare for all other purposes for which it could ever have been used. The right granted to these associates would be the very definition of a franchise. The privilege of making a road or bridge, or of establishing a lerry, and of taking tolls from the citizens for the use of the same, are among the most common examples of a franchise. (3 Kents Com., 458; 2 Bl. Com., 37; Charles River v. The Warren Bridge, 11 Pet., 639, per Story, J.) Chancellor Walworth, in Beckman v. The Saratoga and Schenectady Railroad Company (3 Paige, 75), said: “The privilege of making a road and taking tolls thereon is a franchise, as much as the establishment of a ferry or a public wharf, and taking tolls for the use of the same.” The corporation of New-York may, without doubt, make grants of this character, respecting the public waters which surround the city, but independently of that power, which is in terms conferred by the charters, they have no more authority to make such a grant than any other administrative board in the state If they could make this grant, they could charter, upon the city streets, a turnpike or plank road company. They could grant to individuals the right to pave or otherwise improve the streets, and to impose tolls thereon to be exacted from all who should travel upon them. I do not now speak of the attempt to give a power to establish a succession, in the nature of a corporate succession, for the grant would be equally objectionable in this aspect of it, if it was made to an individual and his assigns. The answer given to this view of the case, upon the argument, was that the board could, in the exercise of what is called its legislative power, rescind its resolution at its pleasure. Without examining the authorities upon which that argument is founded, the applicability of which to this case I am not, however, prepared to admit, I do not see that the grant would be any the less *524 objectionable had it contained upon its face the reservation of a right to rescind it at pleasure. 'The board had no power to grant to any person a franchise for transporting passengers on the public streets, for profit, for a single day, and the attempt to do so was absolutely void.
If the foregoing conclusions are sound, the defendants, at the time the amended complaint was filed, were, of their own authority as private individuals, and without any lawful right, about to convert the central part of Broadway into a railroad, by taking up portions of the pavement and laying iron tracks thereon and putting upon those tracks cars for the transportation of passengers for their own profit; and the. only remaining question is, whether the proper form of remedy has been adopted by the parties who have instituted this suit. I have already said that if authority to establish the railroad had been granted by the legislature, mediately or immediately, the road could not have been a nuisance; and this is all that the cases upon the subject in this state establish. But the defendants were about to proceed without any such authority ; and before speaking of the remedy it is necessary to determine the other question which I have stated, What would have been the legal character of the act if the defendants had been suffered to perform it? In my opiiiion, it would, upon the facts admitted in the answer, have been a public nuisance. Any permanent or habitual obstruction in a public street or highway is an indictable nuisance, although there be room enough left for carriages to pass, and it is not less so though the thing which constitutes the obstruction is not fixed to the ground, but is capable of being and actually is removed from place to place in the street. If the railway proposed to be constructed by the defendants were in operation, it could not fail to happen that Broadway would at all. times during the day be incumbered by a great number of those large receptacles for railway passengers which are an essential part of the apparatus of a railway. If authorized by law to run upon the street, the inconvenience would have *525 to be submitted to ; but if placed there without right, the authors of the act could not defend themselves from the charge of nuisance. The authorities for this position are constant and uniform, and leave no doubt upon the question. (Fowler v. Saunders, Cro.James, 446; The King v. Russell, 6 East, 427; Rex v. Carlile, 6 Carr. & Payne, 636; Rex v. Cross, 3 Camp., 226; Rex v. Jones, id., 230; The King v. Moore, 3 Barn. & Adolph., 184; The Commonwealth v. Passmore, 1 Serg. & Rawle, 219; The King v. Ward, 4 Adolph. & Ellis, 384; The People v. Cunningham, 1 Denio, 524; Hart v. The Mayor of Albany, 9 Wend., 571.) The question is not before us, whether the advantages arising from the establishment of a railroad in the street would not be an ample compensation for all the injury and inconvenience which the public wrould suffer from the obstruction it would occasion. It may be that upon the whole such a change m the character of the street would be a public benefit; but this is for the legislature to determine. In the case of The King v. Ward, which was an indictment for a nuisance, in a navigable river and king’s common highway, by erecting a certain building of stones across the stream and 'water way of the river, the jury found the fact that the alleged nuisance had been erected by the defendant, but that the inconvenience was counterbalanced by the public benefit arising from the alteration thus made. The court held that this finding amounted to a verdict of guilty. Lord Denman, C- J., stated the principle with great distinctness: “ In the infinite variety of active operations always going forward in this industrious community, no greater evil can be conceived than the encouragement of capitalists and adventurers to interfere with known public rights from motives of personal interest, on the speculation that the changes made may be rendered lawful by ultimately being thought to supply the public with something better than what they actually enjoy. There is no practical inconvenience in abiding by the opposite principle, for daily experience proves that great and *526 acknowledged public improvement soon leads to a corresponding change in the law, accompanied, however, with the first condition of being compelled to compensate any portion of the public which may suffer for their advantage.” See also the opinion of Lord Tenterden, in The King v. Russell (6 Barn. & Cress., 566).
It is well settled that where such an offence occasions, or is likely to occasion, a specialinjury to an individual, which cannot well be compensated in damages, equity will entertain jurisdiction of the case at his suit; and also that the attorney-general, in all cases where a preventive remedy is called for by the circumstances, or the state in its own name, may. apply for an injunction against the perpetrator of the wrong. (2 Story's Eq., §§ 921, 922; The Attorney-General v. The Cohoes Co., 6 Paige, 133; Baines v. Baker, Amb., 158; Samson v. Smith, 8 Sim., 272; Spencer v. The Lond. and Birm. R. R. Co., id., 193; The Attorney-General v. Richards, 2 Anst., 603; Corning v. Lowerre, 6 John. Ch. R., 439.)
But the allegation that the plaintiffs were the owners of lots in Broadway was put in issue by the answer, and the affirmative has not been found to be true; and besides, the judge -who tried this cause has found, as a matter of fact, that constructing the railway would not be specially injurious to the plaintiffs. I do not see, therefore, how, consistently with these findings, the action can be sustained in their behalf, and such seems to have been the view of the superior court at special term. The attorney-general was, on that account, made a party plaintiff"; but to the granting of this order the defendants objected, and from it they appealed to the general term. By the terms of the Code that order is reviewable here,_ provided it involves the' merits, and I am unable to deny that if the defendants were entitled to have the complaint dismissed, for want of interest on the part of the plaintiffs, the order, which virtually refused such a judgment, and which admitted the substitution of a party standing in a different and better position in that respect, was one *527 which involved the merits of the action. The names of the original plaintiffs, it is true, remain on the record; but this does not improve the plaintiffs’ case, if they are not m a situation to maintain an action. The general term sustained the judgment, on the ground that the order in question was authorized by certain sections of the Code of Procedure (§§ 122, 173). By the first of these sections, the court is authorized to “ determine any controversy between the parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, the court must cause them to be brought in.” Section one hundred and seventy-three relates to amendments, and is in very comprehensive terms. The court may add or strike out the names of parties, or correct a mistake in any respect; and it may confine the pleading or proceeding to the facts proved, when the amendment does not change substantially the claim or defence. The section first quoted evidently refers to cases where one or more of the original parties had such an interest as would enable him to sustain the action, but where the controversy would not be completely settled without the presence of other parties. This was a familiar rule of the court of chancery, which would have been properly stated in the precise words of this section. The other section contains language, if construed literally, broad enough to embrace this case A possible construction of the power to strike out and to insert the names of parties would admit the striking out of all the existing ones, on the ground that they had no cause of action, and inserting an entirely new set who rea’ly had such right, but this would be too unreasonable to 1 ave been intended. So with the unlimited provision to correct a mistake. It cannot authorize the giving of judgrae it in favor of parties who have no right to the subject in litigation. So also with the provision authorizing the conforming of the pleading or proceeding to the facts *528 proved. This, I think, does not permit an entire change of parties on one side. It obviously relates to the facts given in evidence on the trial.
If the original parties had shown an interest in themselves which would have entitled them to invoke the jurisdiction of the court, and the only difficulty had been that the judgment would not have been complete without the intervention of a party who would represent all others who had a similar interest, the case would be relieved from its present embarrassment. The view of the superior court was, that it presented such a case. By section one hundred and nineteen of the Code, where the question in an action is one of common and general interest or where the parties are very numerous, one or more may sue or defend for the benefit of the whole. This is also a rule borrowed from the practice of the late court of chancery. It would be giving an undue extension to this rule to hold it to embrace such a case as the present. The relief to be granted in this action must proceed upon the ground that the act imputed to the defendants is either a public nuisance, or the usurpation of a franchise detrimental to all the people of the state. It may not affect every citizen equally, but in judgment of law, assuming that no special injury is shown, they have an equal right to complain. Now, it cannot be maintained for a moment that an action will lie by an individual citizen for such an offence. Such a rule would confound all distinctions between public and private-rights and remedies, and wmuld introduce inextricable confusion.
I am of opinion therefore that the judgment appealed iron should be reversed. Whether the complaint should be dis missed depends upon some other considerations. The finding that the railway, if established without lawful authority, would not be a public nuisance, was contrary to the admissions in the pleadings and must be disregarded. It was arrived at, T presume, by taking into consideration the supposed advan *529 tages of a railway; for in one of the opinions with which we are furnished, the question of nuisance in this case is stated to be a problem, wdiich experience alone can solve. Experience would only be useful in balancing the advantages of the railway against the effects of the obstruction and inconvenience it would cause. We have seen that the law regards an unauthorized obstruction of a highway as a nuisance per se. It is also found that the railway would not be specially injurious to the plaintiffs; but there is no finding upon the question whether they were the owners of lots on Broadway, as alleged in the complaint. If the finding, that it would not be specially injurious to the plaintiffs, wras based upon the idea that it was problematical whether it would or would not be upon the whole advantageous to the persons more particularly interested in Broadway as a thoroughfare, as is highly probable from what is said in the papers upon the general question of nuisance, the point was determined upon incorrect principles, and the question should be again submitted to the court, with the law relating to it ascertained and settled. I am therefore in favor of reversing the present judgment and awarding a new trial in the superior court.
Comstock, J.
The judgment should be reversed for the
reasons stated by the chief judge. I am not able, however, to assent to his views in regard to the power of the common council over the subject embraced in the resolution out of which the present controversy has arisen. I am confidently of opinion that the municipal government of New-York may construct, or by mere license authorize others to construct, an iron track in Broadway, adapted to vehicles of the kind used upon railroads, and that licenses may be granted to the owners of such vehicles, as other carriages are now licensed. Without going at large into the discussion my reasons are briefly as follows:
*530 As I have defined this power, it cannot be objected to its exercise that it grants a franchise or monopoly. It is true that railroads are usually built by private corporations, organized under special charters or general laws, and the right so to build and to use them exclusively becomes a corporate franchise. A road thus constructed becomes the property of the corporation which builds it, and all others are excluded from its use. But it by no means follows that a railroad track may not exist in a public highway in a city, open to the public use as a street improvement, under such regulations as the municipal government charged with the superintendence and control of streets may see fit to prescribe. The idea of a corporate franchise, or of a monopoly existing in favor of individuals or associations of individuals, has no necessary connection with a railroad. Railroads are physical improvements, and they may or may not possess the characteristics of a monopoly or franchise according to the conditions under which they are built and used. If they simply constitute a feature of the public highway and are open to the public use, then it is extremely plain that they are not liable to objections of this character.
The inquiry then next occurs, is there an absolute incompatibility between a highway and a railroad track laid upon it for the public use. This is not a question whether the track of a private corporation or of an association of persons can, under municipal or legislative authority, be rightfully laid in a public street without compensation to the owners of the soil, where that is owned by individuals. The course of judicial decision is certainly in favor of that right, upon the ground substantially that the public easement or highway is not destroyed or obstructed, but only used according to a new and improved mode, although the iron track is not owned by the public, and the public can only use it by riding or conveying their property in the cars of those who are its owners. But this I repeat is not the question. Can a highway and a railroad track coexist and *531 constitute one public easement, where no person or corporation can claim an exclusive right to use the track, and where all may use it under such regulations and licenses as the municipal government may provide ? Of this I do not entertain any doubt.
■ But if we were disposed to doubt upon this question, or even to deny the conclusion stated, still the inquiry is not one upon which the law pronounces a judgment until the facts are ascertained, and to ascertain them we have no power. If a municipal corporation, in the exercise of its authority over streets, determines that iron rails and their use by the licensed portion of the public are a legitimate street improvement, I am not aware of any power in us to determine otherwise. We are in possession of no peculiar knowledge which enables us to declare that a city government, chartered with full authority to alter, regulate and improve its thoroughfares, violates its trust or transcends its powers in coming to such a determination, and passing proper ordinances to carry it into effect. For one, I do not know, and I cannot know judicially, that the street known as Broadway, in New-York, will be obstructed, or its usefulness on the whole impaired, by a particular kind of carriage drawn by horses upon an iron rail laid down for that purpose. This use of the street may have both its inconveniences and its advantages. It is not for us to say which will predominate.
Whether the proposed railway will be a nuisance is a mere question of fact, and as such it has been found in the negative on the trial in the court below, after the examination of a large number of witnesses. If it had been found the other way, then it might have been the duty of the court of original jurisdiction to interpose by injunction, and arrest the evil on that special ground, and it might be our duty to affirm the decision. But we have nothing to do with the comparative advantages and disadvantages merely of the proposed change in the street. Those were, considerations pecu *532 liarly addressed-to the knowledge and judgment of the local government, charged with the care of all the streets in the city; and I should regard it as a usurpation by courts of power which does not belong.to them, if they undertake to control the municipal authority in this respect, Courts are certainly not wiser on this subject than the common council of Few-York, and unfortunately for their right to interfere, the supreme- law making power of the state has vested in the council, and not in them, the power to regulate and control the streets of the city.
Such are my views upon the general question. In regard to the particular resolution of the common council authorizing Jacob Sharp and his associates to construct a railroad in Broadway, I have had some doubts whether it could not be sustained as a mere license revocable at pleasure, and imposing no obligations upon the city government; but my conclusion is that this cannot be done. The resolution, in its first clauses, is a simple, authority to Sharp and others to construct the road in the manner specified, but these clauses are so connected with an entire scheme that the whole must stand or fall together. As the consideration for constructing the road, the ordinance clearly contemplates that it is to become the private property of the associates. They alone will be entitled to place their cars upon it, and within a maximum limit they can charge what they please for the carriage of passengers. These rights are in effect granted in perpetuity, because the only provision for their termination is in case the associates, after ten years, shall decline to pay such license fees “as the corporation, with the permissica of the legislature, shall prescribe.” In that event, the road, with its equipments, is to be surrendered at a fair and just valuation. Taking, therefore, the whole ordinance together and giving effect to it according to its terms and intention, it is no less than an abrogation by the common council of their powers and duties over and concerning the public streets, and a surrender of a considerable portion of those *533 powers and duties into the hands of private individuals or of a private corporation. This the corporation of New-York cannot do. Time and experience ma,y, for aught we know, give a very unfavorable solution to the question whether this railroad or any railroad in Broadway can be beneficial to the public, but the hands of the city government will be tied by the contract into which it has entered, and future change and improvement may be prevented by this voluntary surrender of its own powers. On this ground, and without looking at the question in other and more special aspects, I am satisfied that the ordinance is void and that no effect can or should be given to any of its provisions.
Weight, J., also delivered an opinion to the effect: First. That the resolution or ordinance of' the common council, authorizing Sharp and his associates to construct and operate the road, was valid as a license, revocable at pleasure, although in -form a grant or contract; Second. That, conceding the resolution or Ordinance was void, the original parties could not maintain the action, and that the amendment allowing the attorney-general to be made a party plaintiff wras unauthorized and erroneous.
All the judges, except Mitchell, J., who took no pant, were in favor of reversing the judgment and ordering a new trial.
Denio, G. J., Johnson, Selden, Comstock and Hhbbaed, Js., were of opinion that the resolution or ordinance was void.
Weight and T. A. Johnson, Js., dissented from this last proposition.
Judgment reversed and new trial ordered.