Kelsey *v.* King.

---

KELSEY *vs.* KING and others.

A property owner cannot invoke the equitable interposition of the supreme court for any omissions or irregularities in the proceedings of a municipal corporation to open a street.

He may review them by certiorari; or he may put in issue the title of the public authorities of the city to enter upon his lands, by a common law action, which will bring up the regularity of the proceedings to open the street; but he cannot test their effect upon his title by an equitable action.

Nor is he entitled to an injunction, to restrain the construction of a sewer, by persons contracting with the corporation, on the ground of a defect in the form, or in the parties to, the contract.

Kelsey *v.* King.

Under the 8th section of the act of April 15, 1857, in relation to sewerage and drainage in the city of Brooklyn, and the acts amending the same, which declares that should the commissioners, in devising a system of drainage for the entire city, "find it *necessary* to construct a sewer through any street or avenue not opened by law, and such sewer cannot be constructed so as properly to drain any portion of the city, without carrying the same through such unopened street, or avenue," it shall then be lawful for the commissioners to apply to the supreme court, and institute the usual proceedings to open the street, the commissioners are to exercise their own *discretion* as to the sewers, and the location of them, which are to constitute an efficient system of sewerage for the city.

The words used in that section do not indicate an intention, on the part of the legislature, that the unopened streets shall not be appropriated to the uses of the sewerage system unless it is physically *impossible* to conduct the sewerage through the streets already opened to public use; so as to make an *absolute necessity* the condition upon which the commissioners can apply to open a street.

The appropriation of land to the uses of a public street, in a city, in conformity with the statutes and the constitution, confers the right to appropriate it to the uses of constructing a *sewer* devoted to conducting away the impurities and surplus waters collected from portions of the city, without compensation to the owner.

The two uses of land—for a street and for a sewer—are not inconsistent and different; the use for a sewer being incidental to, and within, the use for a public street; and both contributing to benefit the adjoining property.

There is a distinction between an appropriation of land to a rail road company, for the use of its road, and an appropriation thereof for the uses of a public sewer, in a city; the former being for the exclusive profit of the stockholders in the company, and the latter, for the benefit of the public at large; and a rail road being an impediment and an obstruction above, and upon the surface of the street, of the most serious and dangerous character; while a sewer lies below the surface of the street, forms no obstruction, makes no noise, and creates no danger. *Per* BROWN, J.

When a sewer is constructed, through a street already opened to the public, it takes nothing away from the owner of the adjoining land. He suffers no detriment, and no injury, and should the law provide a mode of awarding him compensation, it would be a nugatory provision; for he parts with nothing of value. *Per* BROWN, J.

The right to construct the necessary sewers, in the public streets of a city, to remove and conduct away the impurities which collect therein, to the prejudice and peril of life and health, as well as from the adjoining lots, must from necessity, exist as a right incident to the use of a street..

APPEAL from an order of the city court of Brooklyn, dissolving an injunction.

*Winchester Britton,* for the plaintiff.

*Alexander McCue,* for the defendants.

*By the Court,* BROWN, J.   The plaintiff is the owner in fee of lands in the city of Brooklyn, over and through which Butler street, sometimes called Harrison street, had heretofore been laid out, but not opened for use under the usual proceedings for that purpose.   The defendants, Gamaliel King, John H. Frink, Daniel L. Northrop and William B. Lewis are the commissioners of sewerage and drainage in the city of Brooklyn, under the act of the 15th April, 1857, and the act amending the same, concerning sewerage and drainage in such city.   The defendants, William Kinny and John R. Halliday, are contractors with the commissioners to open a sewer in Butler street.   The plaintiff filed his complaint in the city court, and, upon the grounds to which I shall refer, obtained an injunction restraining the defendants from proceeding to construct the sewer.   The injunction was afterwards dissolved, upon motion, with the condition that should the plaintiff appeal within three days and take short notice of argument, the order should not take effect until the decision of the general term of this court.   The plaintiff appealed, and hence we are to determine whether the plaintiff is intitled to the injunction, which is the principal object of the action.

To enable the commissioners to construct the sewer they instituted proceedings under the 8th section of the act, and presented a petition to this court for the appointment of commissioners of estimate and assessment.   They were appointed and entered upon the execution of the duties of their office.   They made their report, which was duly confirmed at the special term of this court, the plaintiff being heard, in opposition thereto.   One of the grounds upon which he now asks the injunction is the neglect of the commissioners to comply with certain requisites of the statute in regard to

Kelsey *v.* King.

opening streets, and in particular that the notice of the application for the appointment of commissioners of estimate and assessment did not specify the district of assessment. It is an answer to this, as it is to all similar objections, that the plaintiff cannot invoke the equitable interposition of the court for any omissions or irregularities in the proceedings to open the street. He may review them by certiorari, or he may put in issue the title of the public authorities of the city to enter upon his lands, by a common law action which will bring up the regularity of the proceedings to open the street; but he cannot test their effect upon his title by an equitable action.

Another ground upon which he claims the injunction is an informality in the form, or rather in the parties, to the contract with the defendants, Kinny and Halliday, to construct the sewer. The contract is made in the name of the city of Brooklyn. If a contract made in this form should be deemed illegal, the plaintiff is not in a condition to impeach it, or put its validity in question. He is but one of a multitude of the inhabitants and tax-payers of the city, and has no standing in court to litigate in regard to it.

He next asserts, as a ground of his application, the want of all necessity for a sewer in Butler street, and claims the existence of such necessity as a condition precedent to the application to open the street. The act is designed to furnish a system of drainage for the entire city, and requires the commissioners to devise and frame a scheme for the whole city upon a regular and systematic plan, so as to remove the surplus water and the superabundant filth from every part of the city. The object is its purification, and the better health, happiness and convenience of its inhabitants. Such a scheme, it is evident, must have reference to the formation of the ground, its level in various places, with a view to the descent of the waters to be removed, and the communication of the principal sewers with the tide waters into which their contents are to be poured. The 8th section of the act de-

clares that "should the commissioners, in devising such a plan, find it necessary to construct a sewer through any street or avenue not opened by law, and such sewer cannot be constructed so as properly to drain any portion of the city without carrying the same through such unopened street or avenue," it shall then be lawful for the commissioners to apply to the supreme court and institute the usual proceedings to open the street. The argument of the plaintiff is that the word necessary, as used in the section, and the words, "and such sewer or drain cannot be constructed so as to properly drain any portion of said city without carrying the same through such unopened street or avenue," indicate an intention that the unopened streets should not be appropriated to the uses of the sewerage system, unless it was physically impossible to conduct the sewerage through the streets already opened to public use. And thus the absolute necessity would become the condition upon which the commissioners could apply to open a street. Such a construction is not reasonable, for it takes away much of the discretion of the commissioners in the location of the works, and limits and restrains their powers of action, so that a liberal, comprehensive and efficient system of drainage cannot be accomplished; no matter what impediments the commissioners may encounter; no matter what may be the cost and the time required to remove them. Unless these impediments are of such a character that they cannot be removed, their powers are limited to the streets already opened to the public use. The words of the section, in case the commissioners "in devising and framing a plan of sewerage and drainage, find it necessary" to conduct a sewer through an unopened street, and the words "properly drain any portion of said city," which follow almost immediately thereafter, show that the commissioners were to exercise their own discretion as to the sewers, and the location of them, which were to constitute an efficient system of sewerage for the city. The idea of devising and framing a system of sewerage for a large and

growing city, which are the trusts confided to the commissioners, implies a large measure of discretion, for without it they could not be beneficially executed.

The counsel for the plaintiff also contends that the appropriation of the land to the uses of a public street in conformity with the statutes and the constitution conferred no right to appropriate it to the uses of constructing a sewer devoted to conducting away the impurities and surplus waters collected from portions of the city, without compensation to the owner. This presents the question whether the uses are not inconsistent and different; or whether the use for a sewer is not incidental to and within the use for a public street. The case of *Williams* v. *The New York Central Rail Road Co.* (16 *N. Y. Rep.* 97,) is distinguishable from the present, in most of its features. There the dedication was for a street over and through the lands of the plaintiff, and the appropriation had been made to a rail road corporation operating its cars and engines by steam, at the rate of 40 trains each day along the lands of the plaintiff, for the exclusive profit of its stockholders. In the present case the appropriation for the uses of a sewer is for the benefit of the public at large. A rail road, with numerous trains of cars thereon, is an impediment, an obstruction above and upon the surface of the street, of the most serious and dangerous character. A sewer lies below the surface of the street, forms no obstruction, makes no noise and creates no danger. A rail road operated by steam in the streets of a city is a positive injury to the adjoining property, and deteriorates its value. A sewer properly constructed in the center of a public street, is positively beneficial to the adjoining property, and enhances its value. The court of appeals, in the case referred to, adjudged that the two uses—the one for a highway and the other for a rail road—were inconsistent with each other, the latter use nearly superseding the former. That the land was subjected to a double easement. That the dedication of land to the use of a public highway is not a dedication to the use of a rail road

company. That the two uses are essentially different; and that consequently a railway cannot be built upon a highway without compensation to the owner. Now the uses of a public street in a city, and a sewer in the center of the street, are not inconsistent with each other. They are not different. They are in harmony; both contributing to benefit the adjoining property. When a sewer is constructed through a street already opened to the public, it takes nothing away from the owner of the adjoining land. He suffers no detriment and no injury; and should the law provide a mode of awarding him compensation it would be a nugatory provision, for he parts with nothing of value.

The first section of title four of the act of the 17th April, 1854, to consolidate the cities of Brooklyn and Williamsburgh, &c. gives the common council power to cause streets and avenues to be opened and widened, regulated, graded and paved, and to cause sewers, drains, wells and pumps to be constructed therein. The subsequent sections of the title prescribe the manner of opening streets and estimating the value of the lands taken, and the benefits to be derived therefrom. There is much force in the suggestion that in acquiring land for the uses of a street, the damages are estimated and compensation awarded to the owner, not alone for the mere right to pass and repass, but also for the other uses— such as sewers, drains, wells and pumps—referred to in the act. I do not, however, rely so much upon that as I do upon the legal principles to which I shall refer. There are certain powers and privileges incident to the right of way which it may be well to notice. They may be classed generally as those which are necessary to the perfect enjoyment of the right to pass and repass. There is the right to dig the soil and to use the material and timber for the repair of the road. It is evident that as mankind progress in physical and material improvements, these incidental privileges must increase, and be greatly enlarged. The mere right to pass and repass upon the surface of the ground would not fulfill

the conditions of a highway, at the present time. Among the first conditions of a good road is a level surface, and this implies the right to grade, to reduce the elevations and fill up the depressions. The right to do this would hardly be disputed. Another condition is that the road should be kept free from accumulations of water. This would imply the power to make drains and sewers for its removal. Should the water collect upon the adjoining lands in consequence of elevating the depressed portions of the road way, the right and the obligation of the public authorities would necessarily follow for its removal by drains and sewers. It has been held that the right to erect toll-houses and sink wells followed as incidental to the grant of an easement for a turnpike road. (*Tucker* v. *Tower*, 9 *Pick.* 109.) These privileges incidental to the use of a highway must expand and multiply in regard to the streets and avenues of cities. The right to sink wells and cisterns has been freely exercised, and has not, as I am aware of, ever been disputed. Large and copious streams of water flowing through every street and into every house have now become a prime necessity in every healthy and habitable city. No one doubts the right of the corporate authorities to lay down the mains and pipes for this purpose in the public streets without compensation to the owners of the fee. So it is with gas pipes, distributed over the entire city. A complete and comprehensive system of sewerage also becomes a necessity under such circumstances. And the right to construct the necessary sewers in the public streets, to remove and conduct away the waters and impurities which collect therein to the prejudice and peril of health and life, as well as from the adjoining lots, must from necessity exist as a right incidental to the use of a street. When the public intervene with sanitory regulations like those contemplated by the act of the 15th April, 1857, no onerous and irksome burdens are imposed upon the land owners. "Such intervention on behalf of the public is not to be confounded with the old sumptuary laws; for it interferes with things, and not with

persons. Nor can it be compared to attempts to regulate labor or wages, or to restrain trade. For it is not done to procure, by artificial adjustment of something which men can best settle for themselves, some speculative advantage; but, on the principle of *salus populi suprema lex,* to protect one set of human beings from being the victims of disease and death through the selfish cupidity of others. The rules and operations for the protection of health in ancient Rome were of a very radical and peremptory character, and allowed no minor interests to interfere with them. It seems to have been a rule with them that from the time when the foundation of a city was laid to that of the summit of its greatness, no structural operation, public or private, should be permitted to take a shape which might render it a harbor either for disease or crime. And it is to this vigilant forethought, that in the absence of other organized agencies discovered only in our later times, we may attribute the success with which that remarkable people preserved social order throughout so dense and vast a mass of human beings as the inhabitants of the *imperial city in the days of its greatness.*"

It has been suggested that the opening and constructing of a sewer in a public street would conflict with the right claimed and freely exercised by the owners of the fee in cities, of making vaults under the side walks, to be used as the depositories of books and other property. The question however still occurs, who have the superior right, the public or the owner of the fee; for if the right of drainage is incident to the use as a street, then certainly the construction and occupation of vaults below the surface and within the line of the street can be justified only when the public uses are not impaired or invaded. Indeed I do not see how such structures can exist, except by the sufferance and permission of the public authorities. When completed, they may offer no impediment to the public travel. They may be secure against the superincumbent weight. But they cannot be constructed or repaired without creating a chasm or opening in

Kelsey *v.* King.

the street, dangerous and detrimental for the time being, which the municipal authorities would have power to prevent.

The case of *Plant* v. *The Long Island Rail Road Co.*, (10 *Barb.* 26,) was an action by the lessee of a messuage and tenement on Atlantic street, in Brooklyn, over which the defendant had the franchise for a rail road, and under and through which it had also constructed a tunnel for its railway, under an ordinance of the common council. The plaintiff put in issue the right to tunnel the street, and claimed damages for the injury to his business, which was that of selling goods. The general term in New York held he could not recover; and in delivering the opinion Mr. Justice Edwards says, " Although a highway in the country is, as a general rule, needed for no other purpose than as a place of passage and repassage, yet the case is different as to a street in a populous commercial city. There are many uses to which streets in large cities are usually appropriated for the promotion of health, trade, commerce and public convenience, such as the construction of drains, sewers, and the laying water and gas pipes. These are servitudes which are highly beneficial to the public and in no way injurious to the private rights of individuals. They do not interfere with the surface of the street. They in no manner impair the right of free passage and repassage. Neither are they injurious to the adjoining property. On the contrary, they are directly or indirectly advantageous." In these views I concur.

I conclude, therefore, that the plaintiff is not entitled to the injunction; and that the order of the city court must be affirmed, with $10 costs.

[ORANGE GENERAL TERM, September 10, 1860. *Lott, Emott* and *Brown,* Justices.]