Wright, J.
These pleadings show that in the year 1836-the State of Ohio, by its canal commissioners, undertook the construction of the Wabash and Erie Canal, from the state line between Ohio and Indiana to the Maumee Bay,. at or near the town of Manhattan, in Lucas county, and the commissioners appropriated the lands necessary for the construction of the work. Among the lands so appropriated by the state, through its canal commissioners, was a strip one hundred feet wide in the city of Toledo, generally known as the Manhattan branch of said canal. The State of Ohio continued in the possession of the lands appropriated until a portion thereof was transferred to the city of Toledo, the name of the canal having in the meantime been changed from the Wabash and Erie Canal to that of the Miami and Erie Canal. By an act of the’ legislature of March 26, 1864, authority and permission was given the *654 city of Toledo to enter upon, improve, and occupy forever as a public highway, and for the use of water-pipes and for sewerage purposes, that part of the canal known as the Manhattan. Branch-.
By act of January 31, 1871 (3 Sayler’s Stat. 2413), whatever interest remained in the state to that part of the canal which had been abandoned in pursuance of the previous act, was relinquished and transferred to the city of Toledo, and the governor was to execute a deed of quitclaim therefor, which has been done. It is averred in the answer that the State of Ohio acquired a fee simple in this canal property by virtue of the appropriation by the canal commissioners, and that the city of Toledo has now succeeded to that fee simple.
The plaintiff claims to own and hold a portion of this one hundred feet known as the Manhattan Branch. He says he is in possession, and has a carpenter shop on the premises; that the state has abandoned the same, and there is no longer a canal there. He avers that when the property was originally appropriated, no compensation was made or demanded. He says that the city of Toledo claims the property, and threatens to turn him out. He asks that his title be quieted, and the city enjoined from dispossessing.
It will thus be seen that the controversy is about a piece of ground, originally taken for the canal. The canal, for all purposes of a canal, has been abandoned. Plaintiff says he has the legal title. The city of Toledo says it has the legal title, by transfer from the state. The demurrer to the second defense is for the purpose of determining to whom the property belongs.
What are the proper limits to the exercise of the right of eminent domain ? How far the state or its agents may go in the appropriation of private property for public uses ? What is the quality of the title or extent of the estate taken by proceedings of this kind, are questions that have been discussed in the briefs of counsel, with a fullness *655 of learning that has materially lightened the labors of the court.
It is claimed by counsel for plaintiff in error, Malone, that when private property is taken by the state it can only be taken for public use, and that the right of the state only continues so long as that public use continues, and when that use ceases, all interest of the state ceases, and the property is disburdened of any further claim of the state upon it.
The statute under which the canal commissioners appropriated the property, in 1830, provided that when the damages were paid the fee simple of the premises should vest in the state, and it is argued that the title so acquired was no.t a fee simple absolute, but a fee simple conditional, or a fee simple determinable on condition; that that condition was the application of the’ property to the public use, which ceasing, the title taken, at once determined, and the premises reverted to their former owner.
It is therefore insisted that whatever title the state took, even if it be a fee simple, it was a title limited to the uses for which it was taken, and inasmuch as the state has ceased its public use, and turned the property over to the city of Toledo, the estate originally appropriated is entirely at an end.
Upon the other hand, counsel for defendant in error contend, that in the exercise of the right of eminent domain, it was within the limits of legislative discretion to determine as to the quantity and quality of the estate taken, and this discretion was not subject to judicial control, otherwise than to prevent an abuse of power; and if the public necessity required that a fee simple should be taken, it was entirely competent to do so. That the legislature had determined that in appropriating property for the canals of the state, a fee simple was requisite, which having been done, the state became an absolute owner.
In the view we have taken of this case, we do not know that it is necessaiy to determine what name shall be given to the title acquired by the act of appropriation in ques *656 tion. It may be a fee simple absolute or a fee simple conditional.
But whatever the estate is, or however denominated,, wliether fee or easement, as to all property appropriated,, under the exercise of the law of eminent domain, we think this proposition may be established. When real estate is-so appropriated, for one particular public purpose, the fact that it is by legislative authority applied to another public purpose is not necessarily an abandonment, nor is it a forfeiture of the public interest. Instances are abundant in. the legislation of the state where land has been taken for one purpose and used for another, without objection or complaint from any one. Railroads cross highways, and no one has ever supposed that this was such an abandonment of the highway as that the soil reverted to the original owner. So canals have been allowed to use a portion of turnpikes. In the Chagrin Falls case, 2 Ohio St. 419, an ordinary road was converted into a plankroad. And in Hatch’s-case a canal was converted into a railroad, but it was held that this did not work a reversion of the canal bed to the original proprietor. It is now every day’s experience that' streets are used by railroads.
All these are instances where property was appropriated to one particular public use, and afterward, by legislative consent, applied to another of a like kind.
In People v. Kerr, 27 N. Y., it is said : “ So far as the existing public rights in these streets are concerned, such as-the right of passage and travel over them, a little reflection will show that the legislature has supreme control over-them. When no private interests are involved or invaded,,, the legislature may close a highway, and relinquish altogether its use by the public, or it may regulate such use or restrict it to peculiar vehicles or to the use of a particular motive power. It may change one kind of public use into-another, so long as the property continues to be devoted to> public use. What belongs to the public may be controlled! and disposed of in any way which the public agents see fit.. - . . As long as the use to which a highway or any *657 other public property or right is to be applied or transferred is a public use, it is a matter of discretion in the legislature to permit its application or transfer, and the-people must question their action elsewhere than in the courts.”
“ It is not easy, as is very evident, to trace a clear line of authority running through the various decisions bearing upon the appropriation of the ordinary highways and streets to the use of railroads of any grade or species ; but a strong inclination is apparent to hold that when the fee in the public way is taken from the former owner, it is taken for any public use whatever to which the public authorities, with the legislative assent, may see fit afterward to devote it, in furtherance of the general purpose of the original appropriation.” Cooley’s Cons. Lim. *554.
In Lexington and Ohio R. R. v. Applegate, 8 Dana, 289, which has long been an important case on the subject of railroads in cities, the principle is laid down that although highways may not he applied to public or private use incompatible with the ends for which they were established, yet they may be applied to other public purposes than those originally contemplated.
How far a change of use may impose, in the language of the books, an “ additional servitude” upon the soil taken, such as wall entitle adjoining proprietors to further compensation, it is not now necessary to decide. As regards plaintiff below, Malone, none of his rights are predicated upon the fact of adjoining ownership. Pie only alleges that he owns the bed of the canal; and, as to this, it is not evident how any further servitude can by any possibility be imposed. When the ground was taken, the canal built and filled wdth water, it is very clear that nothing more could be taken from the owner, so far as the mere bed of the canal was concerned. What was done with it afterward might affect those who lived upon its banks. If it was turned into a railroad, it might be a nuisance to the an-joining owners. It might subject them to inconveniences *658 they did not before endure, but how it could be any greater inconvenience to one merely owning the canal bed, himself not possessing any adjoining property, can not be made ■clear.
A consideration of this feature of the present case, in connection with two cases in Ohio, will throw light upon the relations of Malone to the city of Toledo.
In the Cumminsville case, 14 Ohio St. 523, the great question was as regards 'the rights of adjoining lot-holders. The street railroad sought to lay down its track upon the turnpike, which was the principal street of Cumminsville. An injunction was allowed iu behalf of Eppel & Russel, who had houses upon the turnpike, until compensation made them or their consent was obtained. No one appeared in that case, as Malone does in this, claiming rights simply as owner of the ground upon which the turnpike or street was built, independent of the fact of adjacent proprietorship. Bearing in mind this fact, an examination of Judge Ranney’s reasoning will show that, at least so far as streets are considered, the soil upon which they exist having been taken for a public purpose, maybe applied to other public purpose of a like kind, the only question being as to the rights of adjoining owners on account of the change of use. Eor instance, he says, on page 544 : “ In the present state of our legislation, the lawful right of one of these companies (street railroad) to occupy and use, in the manner and for the purposes provided by law, a public road or street, when no special and particular injury is done to any individual, ■can not be reasonably doubted.”
Again, he says, page 546, that property appropriated for highways can not be diverted to other purposes than those for which it was acquired, “ nor enlarged so as to accumulate additional burdens upon the land, or destroy or impair the incidental .rights of the owner, appurtenant to his lands located upon the street or highway.”
Erom this we infer that public property may be applied to diffei’ent uses, if they are substantially alike, and ■the legislature allow.
*659 Also that the questions arising upon a change of use relate chiefly to the rights of adjoining owners.
Clearly, then, Malone, simply as the owner of the canal-bed, would have no right to complain of this change of use, whatever rights he might have, were he an adjoining owner, to recover for the additional servitude imposed.
In Hatch’s case, 18 Ohio St. 92, a canal running through Mr. Hatch’s premises, was converted into a railroad. Hatch :sued, among other things, for damages as an adjoining proprietor, and claimed that by the conversion in question the rights of the canal were forfeited and abandoned; that the premises covered by the canal reverted to him, and he was therefore entitled to recover from the railroad the full value of that land.
Of this claim the court speak as follows: “ It is, how•ever, contended in his (plaintiff’s) behalf, that the voluntary giving up of the canal as a canal, by the canal company, to the railroad company, for the uses and purposes of a railroad, is such a change of the uses and purposes to and for which the original appropriation was made by the canal company, as to constitute an abandonment by the canal company of its easement, obtained by the original appropriation, in virtue of which abandonment the land dis-incumbered of the easement of the canal company has reverted to him; and that, therefore, the amount of compensation which he is entitled to exact from the railroad, is to be measured by the value of the land, rather than by an ■estimate of the additional burdens which the change of uses to which the land has been subjected, impose upon him. In this view of the case we can not concur.”
Rrom this case, therefore, it appears, that such a change of uses as this was, only justified Mr. Hatch in complaining, in so far as that change imppsed additional burdens; that is in so far as it affected his rights as adjacent owner. Such change of use did not work a reversion to him of the ■canal bed, although he was an adjacent proprietor. A fortiori, Malone, who was not an adjoining proprietor, could .not claim that such reversion existed in his favor.
*660 Hatch’s case therefore shows, that a change from a canal to a railroad was such a change of use as the legislature-might sanction ; being made, that change did not take away the ground from the corporate authorities and restore it to the former owner; but, at best, left open only such questions as arise in behalf of those who were injured by reason of “ additional servitudes.” With regard to the easement of the canal, the case farther holds, as follows: “ Whether there may or may not be a case of such an utter-contrariety in the uses for which a first appropriation was made, and those to which the land is afterward sought to-be devoted, as necessarily to work an abandonment of the easement, and so a reversion to the owner in fee, we will not assume to say; but such, we think, is not this case. The-general purposes to which the easement was and is applied, are the same, to wit, the purposes of a public way, to facilitate the transportation of persons and property. Means- and appliances are different, but the objects are similar, and the legislation of the state has always favored both.”
However it may be elsewhere, it appears to us to be the-law in this state, that when property has been appropriated for one public purpose, it may be applied to another, not substantially different, and it is still subserving its original uses. Further, that such a change does not afford ground of complaint that the property is wholly forfeited, or the-public rights extinguished.
A change that involves a cessation of all public uses, such as the selling out of public property to private parties, for private ends, would be governed by different considerations, and where such a case arises, it would be controlled by those considerations. It is necessary now to examine only what has been the character of the change as to this canal laud. Clearly, the state could not convey to the city of Toledo any better title, higher right or interest, than the state itself had. The right of the state, confining the property to its public use, is conveyed to the city, ostensibly for “ a public highway, and for the use of water-pipes, and for sewerage purposes.” This is the lan *661 ■guage of the first act. In the second, the state purports to release all its interest.
Since Hatch’s case, the change of a canal to a public highway, such as the street of a city, can not be held to be such a change as to destroy the public interest. The use is still a public one and of the same nature. Does, then, the addition of water-pipes and sewerage require us to say that it is a change to an entirely different purpose ? In the present stage of municipal advancement, it must be ■considered that the public streets of a large city may legitimately be used for such purposes as these. Highways can -not be confined solely to the uses to which they were .adapted in the primitive state of mankind.
In Kelsey v. King, 32 Barb. 410, it was sought to prevent the construction of a sewer because the appropriation of •property for a street conferred no right to apply it to the purposes of constructing a sewer. But it was held that the use of a sewer was incidental to and within the uses of a public street; that the uses were not inconsistent nor different, but in entire harmony.
In this case it is remarked that gas, water, and sewerage purposes are entirely consistent with those of the public streets. It is said: “ Large and copious streams of water, flowing through every street and into every house, have now become a prime necessity in every healthy and habitable city. No one doubts the right of the corporate authorities to lay down the mains and pipes for this purpose in the public streets, without compensation to the owner of the fee. So it is with gas-pipes distributed over the entire city. A complete and comprehensive system of sewerage also becomes a necessity under such circumstances. And the right to construct the necessary sewers in the public streets, to remove and conduct away the waters and impurities which collect therein, to the prejudice and peril of health and life, as well as from the adjoining lots, must from necessity exist as a right incidental to the use of a street.” Similar observations are made in Plant v. Long Island R. R. Co., 10 Barb. 26.
*662 In West v. Bancroft, 32 Vt. 367, an action of trespass was brought against the trustees of the village of St. Johns-bury, because they had constructed a reservoir within the-limits of the highway, the fee of which plaintiff claimed to own. In the opinion, the court say :
“ The power of the public over highways is not confined to their use for the sole purpose of travel. Many things' may be done therein for the promotion of the public convenience and health, such as laying water-pipes, constructing drains and sewers, making reservoirs, and many other-acts which the public may require.” And it is said that when these acts are done judicially, the owners of the fee can not recover damage.
They further say that a reservoir, the object of which was to retain water for sprinkling the streets, and other public purposes, came within the object and purpose for which the highway was originally laid out. It is further said that such acts as tend to facilitate travel, and add to the comfort of the traveler, are acts proper for the public-to do, and tq which the reversioner or'owner of the fee can not object.
As, therefore, water-pipes and sewers are legitimate in a public highway, the fact that the canal has become such a highway, with such incidents, does not show a substantial change of the public use from that for which the property was originally appropriated. And if it appeared that the city of Toledo proposed only to use the premises for the purposes specified in the grant from the state, namely, “ as a public highway, and for the use of water-pipes and for sewerage purposes,” we would be unable to say that there was such substantial change of public use as would defeat all right in the city.
Upon the other hand, We ai’e not prepared to go to the-extent that New York has done, and to say that the state, or the city of Toledo, may take property which has been, appropriated to public uses, and sell it out to private purchasers.
This was held to be lawful in Brooklyn Park Course v. *663 Armstrong, supra, and other cases. The reverse is also held in that state.
Heyward v. Mayor of New York, 3 Seld. 314. In this case land was appropriated by the city of New York for an almshouse. Twenty-seven years afterward it was found necessary to remove the almshouse, whereupon the heirs of the party from whom the property was originally taken claimed that it had reverted, and sued the city for its value, the city having cut the land up into lots and sold it.
The statutes of New York, under which the property was appropriated, appear to have intended that the city should take all the title and interest that could be owned or held by any one. The preamble to one of the acts recites that the mayor, etc., of the city were desirous of obtaining the land, “ with the right of converting and disposing of the said lands and premises for other purposes, or otherwise, whenever they or their successors may deem the continuance ” of the particular public use for which it was taken unnecessary. The acts also provide that upon the appropriation the city “ should become and be seized in fee simple ” absolute of the lands and tenements.
It was held that there was no right of reversion to the original owners or their heirs, although the almshouse had been removed and the land sold to private parties.
This case, and others that might be cited from New York, Pennsylvania, and elsewhere, furnish both argument and authority in favor of the proposition that when the legislature has once declared the use for which property may be appropriated to be a public one, that is the end of the matter, and that this conclusion can not be affected by anything that may afterward occur. Therefore it has been held, in the states named, that property having once been lawfully appropriated, if subsequent events show that the necessity which occasioned its taking has ceased to exist, this does not invalidate the original appropriation, but the public authorities still hold and own the ground, which they may sell out to private parties.
"We do not know that a case involving such a question *664 has ever arisen in Ohio. When it does, it will be necessary to examine the powers of the legislature in that behalf somewhat critically.
If, therefore, this case, like that of the almshouse, showed that the city of Toledo had sold this property to private purchasers, or even proposed so to do, we might be called upon to meet the question whether any such power of sale existed, or whether purchasers would not take the property, still hampered with the conditions which attach to its public character, liable to have the public trust enforced. But nothing of this kind appears in the pleadings before us.
We have thus attempted to show that when property has been appropriated, as this was, for a specified public use, the legislature may authorize a change of that use to another of a like public kind. Also that a change from a canal to a public highway, with water-pipes and for sewerage purposes, is not a change so substantially different from the original purpose, as to justify us in saying that it is a destruction of the public interest. With these principles in view, we examine the pleadings : The answer demurred to avers that the city of Toledo obtained the premises, under the statutes referred to, to hold the same for the purposes in these statutes specified. This it might well do. It is true, the answer further avers that the state acquired the fee and the city holds that title, but of course it must be considered that such holding should, and does, comport with the purposes specified, and the city claims no more than this.
Inasmuch, therefore, as there is nothing to show that the city of Toledo intends to make any other use of the property than that which she might lawfully make, we are bound to presume that she has intended and does intend to do nothing with the ground in question, but to apply it to the legitimate purposes of a highway, which she has the right to do. As the answer must be construed as claiming these rights alone, in behalf of the city, and as there is nothing *665 in the pleadings to show any different purpose, the second claim of the answer is sufficient, as against a demurrer, and the same will be overruled.